**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **EMANUEL JENKINS** | : | |
| | : | |
| **v.** | : | **C.A. NO: 04-453S** |
| | : | |
| **STATE OF RHODE ISLAND, State Police Department, STEVEN M. PARE, individually and in his official capacity as Superintendent of the Rhode Island State Police, MATTHEW MOYNIHAN individually and in his official capacity as a state trooper employed by the State of Rhode Island, Rhode Island State Police, DEREK BOREK, individually and in his official capacity as a state trooper employed by the State of Rhode Island, Rhode Island State Police** | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants State of Rhode Island State Police Department, Matthew Moynihan in his official and individual capacities and Derek Borek in his official and individual capacities, pursuant to Fed.R.Civ.P. 56 and Local Rule 12.1 and move for judgment as a matter of law. Defendants contend that based on the undisputed facts, they are entitled to summary judgment on all counts of Plaintiff's Amended Complaint.

Wherefore, the Defendants pray that this Motion is granted and judgment enter dismissing this case.

Respectfully Submitted,

DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Brenda D. Baum (5184)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016

## CERTIFICATION

I hereby certify that on this 10th day of May 2006 a true copy of the within Motion for Summary Judgment was mailed to:

V. Edward Formisano, Esquire
Sinapi, Formisano & Company
100 Midway Place, Suite 1
Cranston, RI 02920

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **EMANUEL JENKINS** | : | |
| | : | |
| **v.** | : | **C.A. NO: 04-453S** |
| | : | |
| **STATE OF RHODE ISLAND,** | : | |
| **State Police Department,** | : | |
| **STEVEN M. PARE, individually and in** | : | |
| **his official capacity as Superintendent of** | : | |
| **the Rhode Island State Police,** | : | |
| **MATTHEW MOYNIHAN individually** | : | |
| **and in his official capacity as a state** | : | |
| **trooper employed by the State of Rhode** | : | |
| **Island, Rhode Island State Police,** | : | |
| **DEREK BOREK, individually and in his** | : | |
| **official capacity as a state trooper** | : | |
| **employed by the State of Rhode Island,** | : | |
| **Rhode Island State Police** | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case is before the Court on Defendants' Motion for Summary Judgment[1]. The Plaintiff Emanuel Jenkins (hereinafter "Jenkins") filed this amended complaint[2] alleging illegal search and seizure under 42 U.S.C § 1983 and Article I, Section 6 of the Rhode Island Constitution, as well as state tort claims of negligence and battery. Jenkins' claims flow from a lawful stop of his vehicle on June 25, 2002. The Defendants submit that reasonable suspicion existed for the stop and seizure of Jenkins in response to a "be on the look out" ("BOLO") broadcast from the Woonsocket Police Department that

[1] Colonel Steven Pare has been dismissed from this suit by stipulation of the parties.
[2] Plaintiff filed a stipulation that was entered by the Court on December 29, 2005 dismissing Counts II (Assault) and VI (2 U.S.C. §1981) of the Amended Complaint.

accurately described his vehicle, the occupants in it and stated that they were sought for an investigation of an assault with a dangerous weapon – a gun. Moreover, Trooper Moynihan's discharge of his weapon was an appropriate use of force given the totality of the circumstances on June 25, 2002. The Defendants also submit that the application of the doctrine of qualified immunity defeats Jenkins' claims as a matter of law. Therefore, summary judgment is appropriate on all counts of the Amended Complaint.

## II. STATEMENT OF FACTS

For purposes of this motion, the Court must assume that the facts related by Plaintiff Emanuel Jenkins are true. On June 25, 2002 Woonsocket Police Department's dispatchers received two (2) phone calls indicating that there were two black males in a green SUV bearing license plate AARONJ and that they had a gun. *See Exhibit A: Transcription of Be On The Look Out ("BOLO") Radio Broadcast from June 25, 2002 (hereinafter "BOLO Broadcast").* Woonsocket Police documented that one of the callers reported that the individuals in this vehicle had flashed a handgun in a threatening manner to an employee of a barbershop. *See Exhibit B: Woonsocket Police Dispatch log for June 25, 2002.* In response, Woonsocket Police issued a BOLO broadcasted over the Inter-City network with attention to North Smithfield, Lincoln, Cumberland and the Rhode Island State Police. The radio broadcasts stated:

> Woonsocket P.D. to surrounding communities: Please be on the lookout for Rhode Island vanity plate AARONJ, A-Alpha, A-Alpha, R-Romeo, O-Oscar, N-November, J-Juliette. AARONJ. It's a green SUV, possibly a ninety (static) '97 Ford SUV, color green, possibly an Explorer. Described as a hunter green SUV with deep tinted windows. Use caution. Possible handgun was shown. At this time we're entertaining a complaint – at this time we're entertaining a complaint for ADW. Again, it's a silver or a blue small—caliber handgun. Two black males in the vehicle, deep tinted windows, unknown additional occupants. A twen—possibly a .25 or a .22 auto. Again, its AARONJ, green SUV. Use caution if contacted. Woonsocket is going to be cleared at 1611.

***

> …(unintelligible) and surrounding communities: In reference to the BOLO on AARONJ, that's Rhode Island vanity plate AARONJ, '97 Ford Explorer, color green. At this time we do not have a complaint; however we did take an incident report from two separate sources that did confirm that they did see a --- a handgun. Again, use caution if the vehicle's located. There is no active complaint for ADW; however, we do had reason to believe there is a handgun inside the vehicle. Woonsocket's cleared at 16:18.

*Exhibit A: BOLO Broadcast.* The State Police acknowledged receipt of the BOLO and transmitted the information to its cruisers out of the Lincoln and Chepachet barracks. *BOLO Broadcast.* After hearing the broadcast, Trooper Moynihan confirmed through the computer in his cruiser that the vehicle plate "AARONJ" matched the description of the vehicle. *See Exhibit C: Affidavit of Trooper Matthew Moynihan and attached Use of Force and Discharge of Firearms Reports ("Moynihan's Affidavit and Reports").*

Soon thereafter, Trooper Moynihan saw the green Ford Explorer bearing the plates AARONJ traveling on Route 146 south and radioed the information to the R.I. State Police barracks. *See Exhibits A: Bolo Broadcast and C: Moynihan's Affidavit and Reports.* Trooper Moynihan advised that he would not stop the vehicle until back up had arrived. *Id.* While following the vehicle, Trooper Moynihan confirmed there were two (2) African American males in the vehicle. *Exhibit C: Moynihan's Affidavit and Reports.*

Trooper Derek Borek responded as back up and both troopers followed the green Ford Explorer as it exited at the Thurbers Avenue exit in Providence. *Exhibit C: Moynihan's Affidavit and Reports, Exhibit D: Deposition of Trooper Derek Borek at p.19, and Exhibit E: Use of Force Report Completed by Trooper Derek Borek ("Borek's Use of Force").* Trooper Moynihan activated his overhead lights and siren. *See Exhibit C: Moynihan's Affidavit and Reports and Exhibit D: Borek's Depo. at p.20.* The green

Ford Explorer pulled to the right hand side of Thurbers Avenue.[3] Id. It was approximately 5:00 p.m. on a workday, with traffic proceeding in both directions and on Eddy Street, perpendicular thereto. *Exhibit D: Borek's Depo. at p.21.* Trooper Moynihan parked his cruiser to the left rear of the Explorer and Trooper Borek pulled his cruiser behind it. *Exhibit C: Moynihan's Affidavit and Reports.* Trooper Moynihan left his vehicle with his sidearm drawn and took up a position behind his cruiser. *Exhibit C: Moynihan's Affidavit and Reports" and Exhibit D: Borek's Depo. at pp.23-24.* Trooper Borek retrieved a shotgun from the trunk and similarly took cover behind his cruiser. *Id.* Trooper Moynihan yelled to the occupants of the Explorer to place their hands out the window. *Id.* and *Exhibit F: Deposition of Emanuel Jenkins ("Jenkins' Depo.") at pp.50-51.* They complied. *Id.*[4] After confirming that Trooper Borek was covering the passenger, Trooper Moynihan cautiously approached the rear of the Explorer. *Exhibit C: "Moynihan's Affidavit and Reports and Exhibit D: Borek's Depo. at p.23.* He continued to instruct the occupants to "keep your hands up" and "keep your hands out the window." *Exhibit C: Moynihan's Affidavit and Reports.* With his weapon in his left hand, Trooper Moynihan reached out with his right hand to open the driver's door. *Id.* Jenkins contends that Trooper Moynihan tried unsuccessfully to open his door and then instructed him to unlock it. *Exhibit F: Jenkins' Depo. at p.57.* Jenkins pulled his hand in from the window[5]. *Exhibit F: Jenkins' Depo. at p.58.* Jenkins' hands went down to a position that Trooper Moynihan could no longer see them and he believed that Jenkins was

---

[3] Both Trooper Moynihan and Borek were in marked State Police cruisers and were in uniform.

[4] Trooper Borek could not observe the driver from his vantage point because of the heavy tint on the windows. *Borek's Depo. at p.23).*

[5] Trooper Moynihan contends that he immediately repeated the command to keep the hands up once Jenkins pulled them in.

reaching for a gun. *Exhibit C: Moynihan's Affidavit and Reports").* Trooper Moynihan shot once into the Explorer. *Id.* Jenkins's hands immediately came up into view. *Id.* Trooper Moynihan opened the door and removed Jenkins from the Explorer. *Exhibit C: Moynihan's Affidavit and Reports.* Jenkins claims that Trooper Moynihan tried to "yank" him out of the vehicle but his seatbelt was still on and when extricated from it, then threw him to the ground and yelled profanities at him. *Exhibit F: Jenkins' Depo. at pp.58-59.* After a brief pat down for weapons, Trooper Moynihan placed Jenkins in handcuffs. *Exhibit F: Jenkins' Depo. at p.60.* After the passenger was removed from the Explorer and handcuffed, a rescue was called as Jenkins had been shot in the leg. *Exhibit C: Moynihan's Affidavit and Reports. Jenkins' estimates that only one (1) minute elapsed from the time he stopped his vehicle until he was shot. Exhibit F: Jenkins' Depo. at pp.72-73.* Troopers Moynihan and Borek did a cursory search of the passenger compartment of the Explorer to check for weapons. *Exhibit C: Moynihan's Affidavit and Reports and Exhibit F: Jenkins' Depo. at p.66.*

Jenkins was transported by rescue to Rhode Island Hospital, treated and released into State Police custody. *Exhibit F: Jenkins' Depo. at pp.73-74.* Jenkins was arrested and charged with driving on a suspended license. He was later released after bail was posted. *Id.*

## II. ARGUMENT

### A. Standard for Summary Judgment

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the [Civil] Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986). Summary

judgment is lawful and proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[6] and that the moving party is entitled to judgment as a matter of law." R.I. Super. R. Civ. P. 56(c). In addition, "[s]ummary judgment is appropriate against a party who, after a sufficient time for discovery, 'fails to make a showing sufficient to establish the existence of a single element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Torraco v. Maloney*, 923 F.2d 231, 232 (1st Cir. 1991)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986)).

According to Federal Rule 56(e):

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. (Emphasis added).

Based upon the foregoing, the United States Supreme Court observed that the above two sentences of Rule 56(e) were added "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings." *Celotex Corp*, 477 U.S. at 325, 106 S.Ct. at 2554. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514 (1986).

---

[6] "A fact is 'material' if it might affect the outcome of the suit' under the applicable legal standard. *Flowers v. Fiore*, 359 F.2d 24, 28 (1st Cir.2004)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct.2505, 91 L.Ed.2d 202 (1986).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511 (emphasis added). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. at 2511 (emphasis added). As the Court recognized:

> [n]or are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether where is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. *Id.* at 251, 106 S.Ct at 2511 (emphases in original).

Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252, 106 S.Ct. at 2512 (emphasis added).

**B. The Plaintiff's 42 U.S.C. §1983 Claim against The State of Rhode Island, Trooper Matthew Moynihan in his Official Capacity and Trooper Derek Borek in his Official Capacity should be dismissed in Accordance with the United States Supreme Court's holding in Will v. Michigan Department of State Police**

In Count IV, Jenkins brings suit against the Defendants under 42 U.S.C. §1983 seeking monetary damages and declaratory relief. The United States Supreme Court in *Will v. Michigan Department of State Police*, 491 U.S. 58, 62-70, 109 S.Ct. 2304, 2308-09, 105 L.Ed.2d 45, ___ (1989) ruled that a state is not a "person" within the meaning of 42 U.S.C. §1983. Similarly, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and is "no

different from a suit against the State itself." Will, 109 S.Ct. at 2311-12. Thus, state officials named in their official capacity are not "persons" within the meaning of 42 U.S.C. §1983.

Therefore, Count IV against the State of Rhode Island, Trooper Matthew Moynihan in his official capacity and Trooper Derek Borek in his official capacity must fail.

**C. The Plaintiff's 42 U.S.C. §1983 Claims Against Trooper Matthew Moynihan In His Individual Capacity And Trooper Derek Borek In His Individual Capacity Should Be Dismissed Because No Constitutional Violation Has Been Established And/Or On The Basis Of Qualified Immunity.**

***i. Jenkins' Federal Claims***

Aside from a blanket statement in Count IV[7] of his Complaint, Jenkins does not identify the specific actions he alleges violated his Fourth Amendment right to be free from unreasonable search and seizures. Through his answers to interrogatories however, Plaintiff appears to claim that his Fourth Amendment rights were violated on June 25, 2002 when: (1) the troopers stopped his car; (2) the troopers approached his car with their guns drawn; (3) Trooper Moynihan shot him in the leg; (4) Trooper Moynihan allegedly pulled him from the car, threw him to the ground and stepped on his back; (5) Trooper Moynihan handcuffed him while he was on the ground; (6) Trooper Moynihan patted down his waist and legs when he was on the ground; and (7) the troopers searched his vehicle. *Exhibit G: Plaintiff's Answers to Interrogatories.*

[7] Count IV of the Amended Complaint states: "Defendants, acting under color of state law, by their individual and concerted acts and/or omissions, including but not limited to those described herein, caused Plaintiff to be illegally searched and seized in derogation of Plaintiff's constitutional right to be free form unreasonable searches and seizures, causing Plaintiff to sustain damages as aforesaid, and thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to USC §1983."

*ii. Qualified Immunity in 42 U.S.C. §1983 Cases*

For personal liability under 42 U.S.C. §1983 to attach, the law requires a "more particularized" showing than in other actions: namely, that "unlawfulness" under the Constitution be "apparent" based on preexisting law. Anderson v. Creighton, 483 U.S. 635, 640 (1987); Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001). The doctrine of qualified immunity provides an "escape hatch", Camilo-Robles v. Zapata, 175 F.3d 41 (1st Cir. 1999), precluding suits for money damages under §1983 against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982). The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial – of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S. at 816. Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000), citing Malley v. Briggs, 475 U.S. 335, 341, 343 (1986). Without proper immunity for reasonable *mis*interpretation, governmental actors would be placed in the untenable position of facing the burdens of litigation and the risk of liability for guessing incorrectly when the constitutional provision itself provides little guidance. The qualified immunity doctrine exists to protect objectively reasonable decisions from becoming an obstacle to the efficient functioning of state government. The Supreme Court has never held that all decisions made by government officials be correct in all respects—simply that they be objectively reasonable. Implicit in the idea that officials have some immunity for their

official acts is a recognition that they may err. The concept of immunity assumes this and goes on to recognize that it is better to risk some error and possible injury from such error than not to decide or act at all. Scheuer v. Rhodes, 416 U.S. 232 (1974). The law has sought to provide a measure of deterrence against patent violations of recognized constitutional rights, while avoiding the kind of zealousness that would hamper effective decision-making by competent officers acting in a reasonable manner.

The doctrine of qualified immunity rests on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; and (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good. Scheuer v. Rhodes, 416 U.S. at 240.

In applying the qualified immunity defense to a claim brought under 42 U.S.C. § 1983, the Court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Abreu-Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir.2001)(quoting, 562 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). If there was no such deprivation, then the claim must be dismissed. If a constitutional violation is found, "the court must 'proceed to determine whether the right was clearly established at the time of the alleged violation'". *Id.* (citations omitted). It is not enough for the constitutional right to be "clearly established" at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law. Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998).

It is only if the Court finds that a constitutional right was violated and that right was clearly established at the time, will the Court address the particular conduct in question. Abreu-Guzman, 241 F.3d at 73. If the Court reaches this third step, then it analyzes the facts to determine whether an objectively reasonable officer would have understood that his conduct violated a clearly established constitutional right. Id. "In the best of circumstances, '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" Savard, 338 F.3d at 29(citing Bell, 441 U.S. at 559). "Indeed, the Supreme Court itself has acknowledged, in a qualified immunity case, 'the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment.'" Id. (citing Anderson, 483 U.S. at 644). "The law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." Id. at 30.

The Defendants submit that qualified immunity bars Jenkins' search and seizure claims. Plaintiff has failed to establish a violation of clearly established constitutional rights. Moreover, Troopers Borek and Moynihan's actions were objectively reasonable based on the facts known to them at the time of the stop on June 25, 2002. Wherefore, Jenkins' Amended Complaint should be denied and dismissed.

***a. Claims against Trooper Borek***

This Complaint against Trooper Borek should be denied and dismissed. Plaintiff has failed to allege any facts that would support either a Federal or State claim against Trooper Borek. The undisputed facts of this case demonstrate that Trooper Borek

emerged from his cruiser, obtained his shotgun and took a position to cover the passenger of Jenkins' vehicle. Trooper Borek did not approach Jenkins' vehicle, he did not search Jenkins, he did not touch or use any force against Jenkins. Jenkins has failed to allege any actions or omissions by Trooper Borek that support a search or seizure claim under the Fourth Amendment or any state tort claim. Wherefore, Trooper Borek's motion for summary judgment should be granted as a matter of law.

***b. Plaintiff's Search and Seizure Claims***

***i. Stop and Approach of Jenkins' Vehicle***

Jenkins alleges that he was seized in violation of his Fourth Amendment rights because Troopers Moynihan and Borek "pulled [his] vehicle over for no reason" and approached his car with their guns drawn. *See Exhibit G:* Jenkins Answers to Amended Interrogatory number 2. The undisputed facts show that the Defendants had a reasonable and articulable suspicion of past and/or present criminal activity to stop and approach Jenkins's vehicle on June 25, 2002.

"The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, __(1985). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United* States, 517 U.S. 806, 809, 1116 S.Ct. 1769, 1772, 135 L.ed.2d 89, __ (1996). The courts have established a two (2) prong test to determine whether an investigatory stop is reasonable under the Fourth Amendment: (1) "whether the officer's action was justified at its inception; and (2) whether the actions

taken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *United States v. Maguire*, 359 F.3d 71, 76 (1st Cir. 2004). With regards to the first prong, the Fourth Amendment permits law enforcement officers to conduct an investigatory stop if they have "reasonable and articulable suspicion" of past or present criminal activity. *Flowers*, 359 F.3d at 29 (citing *United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir.1996)).

In this case, Troopers Moynihan and Borek had, at the very least, a reasonable and articulable suspicion of past or present criminal to conduct an investigatory stop of Jenkins' vehicle on June 25, 2002. The Woonsocket Police Department had broadcasted to surrounding police departments, including the State Police, to be on the lookout for a hunter green Ford SUV with tinted windows, bearing the license plate AARONJ. The Woonsocket Police related that they had received two (2) reports that the two black occupants of the vehicle were displaying a gun and allegations of a possible assault with a dangerous weapon. Plaintiff was the driver of the hunter green Ford SUV with tinted windows, bearing the license plate AARONJ on June 25, 2002 at the time of this broadcast. Before even seeing Jenkins' vehicle, Trooper Moynihan confirmed, through the use of the computer in his cruiser, that the license plate AARONJ was in fact registered to a green Ford SUV. Once he saw this vehicle on the highway, Trooper Moynihan was able to confirm that the occupants were two black males. In light of the broadcast from Woonsocket Police Department, Troopers Moynihan and Borek had, at the very least, a reasonable and articulable suspicion of past or present criminal to

perform an investigatory stop of Jenkins' vehicle. Thus, the first prong has been satisfied.

The second element, addresses the actions taken by the officers during the investigatory stop and whether such actions where limited to those necessary to dispel the suspicion that justified the stop or exceeded such that it turned the stop into a de facto arrest requiring probably cause. Flowers, 359 F.3d at 29. As the First Circuit explained in Flowers:

> The Supreme Court has stated that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]. Michigan v. Summers, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Since *Terry*, the *Terry* exception allowing detentions without probable cause has been broadened to encompass other situations where officers may make brief investigative stops and detain individuals upon reasonable suspicion that they may have committed, are committing, or are about to commit a crime. There is no " 'litmus-paper test' " to determine whether a particular detention goes beyond a *Terry* stop and amounts to a *de facto* arrest. United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998)(quoting Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Generally, we say that an investigatory stop constitutes a *de facto* arrest "when a 'reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (quoting Berkemer v. McCarty, 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). However, in a borderline case where the detention at issue has one or two arrest-like features but otherwise is consistent with a *Terry* stop, it will not be obvious just how the detention at issue ought reasonably to have been perceived. Such a case requires a fact-specific inquiry into whether the measures used by the police were reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop. *See* United States v. Young, 105 F.3d 1,8 (1st Cir. 1997)("our cases in this area evince the fact specific nature of the inquiry").

Id. at pp. 29-30. Jenkins has never raised the length or scope of the detention as a Fourth

Amendment issue. In fact, by his own admission, only several minutes elapsed from the time his vehicle was stopped until the ambulance arrived to bring Plaintiff for treatment. Thus, the June 25, 2002 stop of Jenkins was supported, at the very least by a reasonable and articulable suspicion, and cannot be considered unreasonable under a Fourth Amendment analysis.

The fact that Troopers Moynihan and Borek approached the car with drawn weapons neither transformed the stop into a de facto arrest nor was it an unreasonable use of force in violation of the Fourth Amendment. An officer's display of a gun during an investigatory stop does not necessarily exceed the Fourth Amendment limits enunciated by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Rather, the circumstances surrounding the investigatory stop may warrant a display of weapons. *Flowers*, 359 F.3d 24, 30 (1st Cir. 2004)(Officers drawing of their firearms when faced with a report of an armed threat did not transform an investigatory stop into an arrest.); *United States v. Maguire*, 359 F.3d 71, 78 (1st Cir. 2004)(Appropriate for officers to approach with drawn weapons where there was reasonable suspicion the occupant was involved in an armed robbery); *United States v. Trueber*, 238 F.3d 79, 91 (1st Cir. 2001) (Agent's drawing of gun and holding it at his side while approaching the vehicle was reasonably related in scope and circumstances to the investigatory stop of the occupant suspected of dealing in narcotics, a trade that goes hand-in-hand with guns, and agent was concerned for his safety. The agent's use of a weapon did not negate the investigatory nature of the stop.) *United States v. Jackson*, 918 F.2d 236, 238 (1st Cir. 1990)(Officers' actions of blocking the path of the vehicle and approaching it with "weapons on the ready on a reasonable suspicion that its occupants

are armed" did not transcend an investigatory nature of the stop); United States v. Maguire, 918 F.2d 254, 259 (1st Cir. 1990). See also United States v. Taylor, 162 F.2d 12, 21 (1st Cir. 1998); United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987).

A law enforcement officer's display of a gun during an investigatory stop may also be a reasonable response to the circumstances that caused them to conduct the investigatory stop in the first place. The United States Supreme Court recognized in *Terry* the balance between an individual's Fourth Amendment rights and the safety of law enforcement. The *Terry* Court explained:

> ...we are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country may law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

392 U.S.at 23, 88 S.Ct. at 1881. At the time of the *Terry* decision, the United States Supreme Court acknowledged that in 1966 fifty-seven (57) law enforcement officers were killed in the line of duty in this country bringing the total to 335 for the seven year period beginning with 1960 and in that same year 55 out of the 57 officers killed died from gunshot wounds, 41 of them inflicted by handguns easily secreted about the persons. *Id*. at 1881, FN 21. Referencing the same resource[8] as the United States Supreme Court did in *Terry*, in 2001 one hundred forty-two (142) law enforcement officers were feloniously killed in the line of duty in this country bringing the total to six

---

[8] Federal Bureau of Investigation, Uniform Crime Reports for the United States, 2001

hundred forty-three (643) for the period of 1992 to 2001.[9] In 2001, sixty-one (61) of the one hundred forty-two (142) law enforcement officers feloniously killed died from gunshot wounds; forty-six (46) of them were inflicted by handguns.

The *Terry* Court extrapolated that:

> [I]n view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situation where they may lack probably cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be unreasonable to deny the officer the power to take the necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.* at 1882. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1883. Following the Supreme Court's lead, the First Circuit has held that "[w]hile Terry Stops generally are fairly unintrusive, we have repeatedly stressed that officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. *See United States v. Lee*, 317 F.3d 26, 31-32 (1stCir. 2003); *United States v. Acosta-Colon*, 157 F.3d 9, 18 (1stCir. 1998); *United States v. Trullo*, 809 F.2d 108, 113 (1stCir. 1987)." *Flowers*, 359 F.3d at 30.

In this case, Troopers Moynihan and Borek were confronted with an armed threat as reported to them through the Woonsocket Police Department. Both had received the information over the police network from the Woonsocket Police Department that a green Ford Explorer, license plate AARONJ, with deep tinted windows, was carrying two black

[9] See Tables 2 and 3

males, that they had received two incident reports about a possible assault with a dangerous weapon, and to use caution as there was a possible handgun in the vehicle. The credibility of the report was additionally substantiated by the detailed description of the gun, i.e., a silver or a blue small—caliber handgun, possibly a .25 or a .22 automatic. Within approximately an hour after the broadcast, Trooper Moynihan and Borek stopped the vehicle and approached it with their guns drawn. It was not unreasonable under the circumstances for Troopers Moynihan and Borek to execute the *Terry* stop with their weapons drawn, for their safety as well as the surrounding public. See *Flowers*, 359 F.3d at 30. Jenkins acknowledges that Trooper Borek's gun was not aimed at him; but rather his passenger. Accordingly, Troopers Moynihan and Borek's drawn weapons comport with the Fourth Amendment and were a reasonable use of force.

Trooper Moynihan's decision to approach the vehicle does not amount to a constitutional violation. The Plaintiff does not have a constitutional right to have a traffic stop, whether it is an unknown or high-risk stop, to be performed in any stated fashion. If stops were to be performed in a mechanical and predictable fashion in all circumstances, law enforcement would be exposed to an unreasonable and unconscionable risk of harm. The United States Supreme Court has recognized and condoned the interest of law enforcement "in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23, 88 S.Ct. at 1881, *see also Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Michigan v. Long*, 463 U.S. 1032, 1048, 103 S.Ct 3469, 3481, 77 L.Ed.2d 1201, ____ (1983). Moreover the United States Supreme Court cautioned courts in second guessing the procedural means chosen to accomplish and

dispel suspicions in an investigatory stop in United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The Supreme Court cautioned that "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself render the search unreasonable.' Citations omitted. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." Sharpe, 470 U.S. at 686-687, 105 S.Ct. at 1575-1576.

The Fourth Circuit addressed permissible safety precautions and alternatives taken by law enforcement when conducting a traffic stop of a vehicle with heavily tinted windows in United States v. Stanfield, 109 F.3d 976 (4th Cir.1997); *cert. denied* 552 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997). In Stanfield, three Baltimore Police officers[10] were patrolling a high crime area known for drug trafficking and observed a Pathfinder with heavily tinted windows illegally parked. 109 F.3d at 978. When the vehicle did not move, the police noticed that the driver was speaking to two (2) men in a second floor window, one of whom they recognized to be a known drug dealer. Id. The officers exited their cruiser and approached the Pathfinder from both the driver and passenger sides. Id. Due to the tint of the vehicle, the officers could not see into it. Id. Because of the tint, one officer opened the passenger side door to see if the occupant(s) were armed or had access to weapons. Id. at 978-79. The Fourth Circuit found that under the facts of this case, the limited intrusion by the officer opening the door was

[10] The officers were wearing bulletproof vests over the uniforms because of the dangerousness of their patrol. Id.

outweighed by officer safety and thus, no Fourth Amendment violation existed.

In reaching its decision, the Fourth Circuit explained:

> Even where the interiors of vehicles are fully visible, "roadside encounters between the police and suspects are especially hazardous," *Long*, 463 U.S. at 1049, 103 S.Ct. at 3481, with as many as "30% of police shootings occur[ing] when a police officer approache[s] a suspect seated in an automobile," Mimms, 434 U.S. at 110, 98 S.Ct. at 333; *see also Adams v. Williams*, 407 U.S. 143, 148n.3, 92 S.Ct. 1921, 1924, n.3, 32 L.Ed.2d 612 (1972). In fact, as the Court noted recently in *Wilson*, in 1994 alone, 5,762 assaults on police officers occurred during the course of traffic pursuits or stops. *See Wilson*, 519 U.S. at ___, 117 S.Ct. at 885 (citation omitted). Thus, "it [is]'too plain for argument' " that the governmental interest in officer safety during traffic stops is substantial. *Id.* at ----, 117 S.Ct. at 885(quoting, *Mimms*, 434 U.S. at 110, 98 S.Ct. at 333).
>
> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.* As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on him from the moment the stop was initiated. As one officer put the obvious: "If the suspect has a weapon, I might not see it until he rolls down the window. He may just shoot me through the window." If, as the Court has noted, officers face an "inordinate risk" every time they approach even a vehicle whose interior and passengers are fully visible to the officers, Mimms, 434 U.S. at 110, 98 S.Ct. at 333, the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable. In fact, it is out of recognition of just such danger that at least twenty-eight states, including Maryland, have now enacted laws either regulating or altogether prohibiting the use of tinted windows on vehicles in their states.

*Id.* at 981-982. Despite this danger, the *Stanfield* Court recognized the importance of not hamstringing police officers to a single prescribed manner to conduct an investigatory

stop. The *Stanfield* Court expounded that:

> Even if there were reasonable alternatives to allowing officers to open the door of a vehicle with heavily tinted windows in order to ascertain whether the driver is armed and whether there are other occupants in the vehicle, we would hesitate to impose them on the law enforcement community as a matter of constitutional law. As the Supreme Court has been at pains to observe, during *Terry*-type stops, officers "must make ... 'quick decision[s] as to how to protect [themselves] and others from possible danger' " at times when they are "particularly vulnerable," and thus it has "not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in [such an] encounter." *Long*, 463 U.S. at 1052, 103 S.Ct. at 3482(quoting *Terry*, 392 U.S. at 28, 88 S.Ct. at 1883); *see also id.* at 1052 n. 16, 103 S.Ct. at 3482 n.16. That is, the Court has scrupulously avoided substituting its judgment for that of law enforcement as to how best to ensure officer safety.
>
> With that said, however, we are at a loss to identify an acceptable alternative to a rule such as that we suggest would be justified. Upon a moment's reflection, it becomes apparent that neither requiring officers (while in their cruisers or as they proceed toward the stopped vehicle) instead to order occupants to exit the vehicle nor requiring that they order that all of the vehicle's doors be opened, represents an acceptable, or even a reasonable, alternative. *To require officers to order the vehicle's occupants to exit as the officers approach the stopped vehicle exposes the officers to the very danger to which we believe it is unconscionable to subject them, namely, that they might be fired upon as they approach the vehicle.* As the Court observed in *Terry*, it is by definition "unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23, 88 S.Ct. at 1881. On the other hand, to insist that officers remain in their vehicles and order the occupants out ignores the fact that, with heavily tinted windows, the officers could never know whether all of the vehicle's occupants had exited; and, eventually, the officers would still be required under this alternative to approach a vehicle which, insofar as the officers could know, still held passengers who might be armed and dangerous. Ordering that the vehicle's doors be opened, of course, allows the vehicle's occupants legitimately to move about the vehicle in ways that would enable them to access available weapons, which represents a separate danger unto itself.
>
> Therefore, in the end, we believe, it will be impractical, if not impossible, for law enforcement officers to neutralize the dangers to which they are exposed by virtue of heavily tinted windows. There simply do not appear to be any alternatives to the bright-line rule we suggest, which would infringe less on the residual privacy interests that drivers and passengers retain in the interior compartment of a lawfully stopped vehicle, yet still

> allow law enforcement officers to take that control of the situation that enables them to minimize the risk of harm to themselves and to the vehicle's occupants. *Cf. Wilson*, 519 U.S. at ---, 117 S.Ct. at 886 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.") (quoting *Michigan v. Summers*, 452 U.S. 692, 703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981)). A bright-line rule that officers could always pursue the course of opening the door of a tinted-windowed vehicle when, in their informed judgment, such an act appears necessary to protect their safety, would not render the stops of such vehicles risk-free, but it would at least reduce to an extent the enormous danger to which law enforcement authorities are exposed as a consequence of the advent of tinted windows.

109 F.3d at 983. *Emphasis Added.*

Like the officers in *Stanfield*, Trooper Moynihan chose the alternative of approaching Jenkins' vehicle with his handgun drawn. Trooper Moynihan's decision was based on the totality of the circumstances surrounding the stop, his concern for safety and his experience as a Rhode Island State Police Trooper for the prior five (5) years. Neither this Court nor Plaintiff's expert should engage in *post hoc* evaluation of Trooper Moynihan's decision to approach Jenkins' vehicle and seek[11] to find fault by citing some alternative means by which the objectives of the police might have been accomplished. Jenkins has failed to establish that Trooper Moynihan's approach of his vehicle constituted a constitutional violation and, at the very least, the approach of the vehicle was not a clearly established constitutional right at the time of the incident and thus qualified immunity bars this claim.

### *iii. Handcuffing of Plaintiff on Ground*

Given the totality of the circumstance, the handcuffing of Plaintiff was permissible under the Fourth Amendment. A police officer may use restraints during a

[11] Especially when, as the Stanfield Court said, that alternative approach exposes the officers to "unconscionable danger."

*Terry* stop if there exists "'some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'" *Id.*, (citing *Acosta-Colon*, 157 F.3d at 18-19). The police may order the suspects to the ground and then conduct a search for weapons without converting the investigatory nature of the stop. *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir.1998)(First Circuit held that officer's action of putting suspects on the ground and searching for weapons was within scope of a *Terry* stop). "When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons." *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir.1994)(Seventh Circuit found it reasonable for police to order bank robbery suspect out of car, lie on the ground and handcuff him during an investigatory stop. Seventh Circuit cited decisions from other circuits consistent with this holding.). *See also*, *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir.1999)(Eighth Circuit found that the investigatory nature of the stop was not exceeded when suspect in drug trafficking was handcuffed while officers searched his truck as there was a good possibility of weapon); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997)("[A] *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground. Police officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a Terry stop.") See also, *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996)("pointing a weapon at a suspect and handcuffing him, or ordering him to lie

on the ground, or placing him in a police car will not automatically convert an investigatory stop into an arrest that requires probable cause"); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995)("[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable"); *United States v. Purry*, 545 F.2d 217, 220 (D.C.Cir. 1976)(officer making stop entitled to use reasonable force, in the form of handcuffing, to maintain status quo).

Based on the facts of this case, it was both a reasonable use of force and consistent with the tenets of *Terry* for Jenkins to be placed on the ground and handcuffed during the course of this investigatory stop. First, Plaintiff has admitted that Trooper Borek did not place him on the ground or handcuff him. Regardless, both troopers had information that the two black male occupants of the green Ford Explorer with license plate AARONJ were in possible possession of a handgun, specifically a .22 or .25 automatic. That the Woonsocket Police had received incident reports about a possible assault with a dangerous weapon and they were instructed to approach this vehicle with caution. Based on this reasonable suspicion that Jenkins may be armed and dangerous, Trooper Moynihan was justified in using handcuffs to preserve the status quo and protect himself, his fellow officer and the surrounding public. Wherefore, Jenkins has failed to show a constitutional violation

*iv. Terry Patdown*

The *Terry* Court held that a police officer may perform a protective search for weapons where he possesses an articulable suspicion that an individual is armed and dangerous. 392 U.S. at 24, 88 S.Ct. at 1881. Specifically:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, ... and where nothing in the initial stages of the encounter serve to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1868. "The officer need not be absolutely certain that the individual" is engaged in an unlawful enterprise; "the issue is whether a reasonably prudent man in the circumstances would be warranted in his belief" that the suspect is breaking, or is about to break, the law. *Id.* at 27, 88 S.Ct. at 1868. A *Terry* stop requires only a "minimal level of objective justification," *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and an officer may initiate one "based not on certainty, but on the need to 'check out' a reasonable suspicion." *United States v. Clark*, 24 F.3d 299, 303 (D.C.Cir.1994).

In this case, based on the information conveyed by the Woonsocket Police Department, Trooper Moynihan had a reasonable suspicion that Jenkins may have been armed and dangerous. By Jenkins' own admission, Trooper Moynihan's search was a cursory pat down. Trooper Moynihan's actions were appropriate and comport with the Fourth Amendment.

### *vi. Removal from Vehicle and Stepping on Back and Discharge of Weapon*

Plaintiff Jenkins asserts a claim that his Fourth Amendment rights were violated based on an excessive use of force by Trooper Moynihan. Defendants disagree.

"[C]laims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's 'objective reasonableness standard," not under the substantive due process principles." Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing Graham, 490 U.S. at 388, 394). "The distinction between excessive force and permissible force turns on whether the level of force used was reasonable and the test is whether, under the circumstances confronting the defendant at the time that he acted, 'no objectively reasonable officer would have used the same degree of force. Isom v. Town of Warren, 360 F.3d 7,1 2 (1st Cir. 2004); *see* Napier v. Town of Wyndham, 187 F.3d 177, 183 (1stCir. 1999)(''The relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances.'(internal quotation omitted))." Jenning v. Pare, 2005 WL 2043945 (D.R.I. 2005); appeal pending before the First Circuit, 05-2522.

The force must be objectively reasonable under the totality of the circumstances. Graham, 109 S.Ct. at 1873. The issue is "whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them without regard to their underlying intent or motivation..." *Id.* at 1872. Factors to consider when determining whether the force used was objectively reasonable include the severity of the crime at issue, whether the suspect posed a threat to the safety of officers or others, and whether the arrestee actively resisted arrest or attempted to avoid arrest. *Id.* The plaintiff has the burden of demonstrating that excessive force was used. Isom, 360 F.3d at 10.

However, in analyzing the facts, courts should be mindful that ".. 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation, and the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective," _Graham_ 109 S.Ct. at 1865. _Saucier_, 533 U.S. at 205, 121 S.Ct at 2158. The Court should be cautious to avoid a "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene." Id. "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. _Saucier_, 533 U.S. at 209, 121 S.Ct. at 2151. Moreover, if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. _Saucier_, 533 US at 205, 121 S.Ct at 2158.

A court's excessive force analysis is distinguishable from a qualified immunity analysis. _Saucier_, 533 U.S. at 204. A separate inquiry must occur when an officer raises the defense of qualified immunity to a civil claim of excessive force. As the _Saucier_ Court explained:

> The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

_Saucier_, 533 U.S. at 205, 121 S.Ct. at 205. "Qualified immunity operates in this case, just as it does in others, to protect officers from the sometimes 'hazy border between

excessive force and acceptable force,' *Priester v. Riveira Beach*, 20 F.3d 919, 926-927 (11th Cir.2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158. An officer is entitled to qualified immunity if they have reasonable, but mistaken, beliefs as to the facts establishing the amount of force necessary. *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158.

A court should be mindful in addressing excessive force claims that a practice of denying a summary judgment motion "any time a material issue of fact remains on an excessive force claim – could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2157, 150 L.Ed.2d 272, __ (2001). The First Circuit explained that "[p]erhaps a jury could rationally have found that [the officer] could have done a better job; but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as [the officer] – in circumstances that were assuredly 'tense, uncertain, and rapidly evolving..." *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994). See also *Vaughn v. Cox*, 316 F.3d 1210 (11th Cir.2003)(The Eleventh Circuit ruled that an officer was entitled to qualified immunity on a claim of excessive force under 42 U.S.C. §1983 even though a reasonable jury, under the plaintiff's version of the events, would find the officer's conduct violated the Fourth Amendment); *Weaver v. Hanna*, 122 F.Supp.2d 1(D.C.Cir.2000)(Qualified immunity barred excessive force claims against officers and Judge held that "[t]he dispute of facts here – whether plaintiff was "slammed" to the ground or placed him on the ground – is

not for a jury."); Palmer v. Unified Government of Wyandotte County/Kansas City, 72 F.Supp.2d 1237 (D.KS1999). [12]

*** Removal from Vehicle and Stepping on Back**

Jenkins' excessive force claims are based on the allegation that Trooper Moynihan (1) discharged his sidearm and (2) pulled him out of the car, put him on the ground and placed a foot on his back. Qualified immunity should bar Jenkins' excessive force claims. Trooper Moynihan reasonably believed that Jenkins had been reaching for the .22 or .25 caliber gun that the Woonsocket Police Department had broadcasted was being brandished by the occupants of this very vehicle and, thus Jenkins was quickly removed from his vehicle to restrict access to any type of weapon. If the removal and initial restraint of Jenkins was performed in less than gentle fashion, such actions are clearly consistent with the United States Supreme Court and First Circuit's boundaries of conduct protected by qualified immunity. Moreover, Jenkins failed to show any injuries arising from these alleged removal from the car and placing on the ground.[13]

---

[12] *Saucier*, *supra*. (Officer was entitled to qualified immunity to Plaintiff's claim of excessive force alleging a "gratuitous violent shove" into police van); Palmer v. Unified Government of Wyandotte County/Kansas City, 72 F.Supp.2d 1237 (D.KS1999)(Police officers were entitled to qualified immunity as a bar to Plaintiff's excessive force claim where he alleged that he cooperated but officers knocked keys out of his hand injuring his wrist, placed in a "choke hold" and was handcuffed so tightly that it cut into his skin.); Dean v. City of Worcester, 924 F.2d 364 (1st Cir.1991)(Police, who mistakenly identified plaintiff as an escaped felon, were entitled to qualified immunity to Plaintiff's claim of excessive force where it was alleged that the officers pushed him to the sidewalk causing his face to hit the sidewalk, placed a gun to his ear and threatened to blow his head off, plaintiff felt a knee to his back and a slight kicking at his feet, was tightly handcuffed and pushed against a wall suffering a cut to his scalp.)

[13] Lastly, in analyzing whether the officers used unreasonable force, the Court should consider the extent, if any, of an injury suffered by Plaintiff. Defendants recognize that Plaintiff need only show a de minimis injury to proceed on his Complaint; however, the severity of the injury also may be considered when reviewing the allegation of excessive force. Bastien v. Goddard, 279 F.3d 10 (1st Cir.2002).

* ***Discharge of Sidearm***

Trooper Moynihan's discharge of his weapon is similarly protected by the doctrine of qualified immunity based on two prongs of this legal test. First, the case law demonstrates that Trooper Moynihan's actions did not violate a clearly established right on June 25, 2002. Second, Trooper Moynihan's actions were objectively reasonable based on the facts known to him on June 25, 2002. Even assuming Jenkins' version of the facts that he pulled his hand in to merely unlock his door, Trooper Moynihan would be entitled to qualified immunity as he had a reasonable, but mistaken, belief as to the facts establishing the amount of force necessary.

First, this Court must determine whether the right was clearly established at the time of the incident on June 25, 2002 (i.e., "whether the officer had fair notice that his conduct was unlawful." Jennings, 2005 WL 2043945 at p.8 (Pending appeal at First Circuit, No. 05-2522), (*citing* Brousseau v. Haugen, __ U.S.--, _--, 125 S.Ct. 596, 601, 160 L.Ed.2d 583 (2004)). As previously stated, the backdrop for conducting this analysis is not in the abstract, but rather, in the specific context – whether in the circumstances faced by the officer, he should have reasonably understood that his conduct violated clearly established law." *Berthiaume*, 142 F.3d at 15. In an excessive force case, unless it is obvious that the force used was excessive, the Court must look to prior case law to determine whether it was clearly established that the Constitution prohibited the type of conduct in which the officer engaged under the specific circumstances confronting the officer. (*See* Brosseau, 125 S.Ct. at 599)". Jennings at p.9. Similar to the reasoning in *Jennings*, under the facts of this case it is not obvious that Trooper Moynihan used

excessive force; this is one of those "close cases" in which there is a "hazy border between excessive and acceptable force." *Id*. (citations omitted).

The Defendants submit that the law was not sufficiently established such that it would be clear to Trooper Moynihan that discharging his weapon one time based on the reasonable belief that Jenkins was reaching for the .22 or .25 caliber gun that the Woonsocket Police Department broadcasted had been brandished by the occupants of this very vehicle, was a constitutional violation. The decisions of the First Circuit do not provide any clear guidance to an officer on this issue.

In *Maiorana v. MacDonald*, 596 F.2d 1072, 1074 (1st Cir. 1979), police officers received information from informants that Anthony Maiorana (hereinafter "Maiorana") was selling guns and was involved in an armed robbery. Through the use of a listening device, the police heard a conversation between an informant and Maiorana wherein, the latter was asked whether he went back to the apartment to get his gun, which he answered in the affirmative. *Id*. at 1076. The police officers then conducted a motor vehicle stop of the car Maiorana was in. *Id*. Two officers approached the car from the driver's side and two from the passenger's side, their weapons drawn, displaying their identification and shouting warnings not to move. *Id*. The informant reached from the front seat to the back seat of the car and tried to restrain Maiorana's hands. *Id*. A shot was fired and the informant was hit. *Id*. One of the police officer's stated that he fired a single shot at Maiorana when he saw him reach for his waist. *Id*. Thereafter, several officers shot into the car. Id. Maiorana died at the hospital. *Id*. Maiorana's mother filed the 42 U.S.C. §1983 action as administratrix of her son's estate.

In granting the officers' motion for summary judgment, the district court found that:

> ... there was no genuine dispute concerning the reasonableness and good faith of the officers, who the court found had grounds to believe that Maiorana was armed and dangerous and who were called upon to act decisively under the circumstances. The court characterized the plaintiff's counteraffidavits as "mostly conclusory allegations ... (about) the state of mind if the officers ... (and) a speculative, unsupported and self-serving analysis of the circumstances surrounding the arrest."

Id. In affirming the District Court's decision, the First Circuit acknowledged that "'police officers ... must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office" and that an "arrest may sometimes entail the use of deadly force and that liability under §1983 will not arise if the officers involved reasonably believed in good faith that such force was necessary to protect themselves or others from death or great bodily harm." Id. at 1078 (citations omitted). The First Circuit agreed with the lower court's reasoning and dismissed the suit against the officers based qualified immunity.

The Defendants submit that the First Circuit cases that follow *Maiorana* do not provide clear guidance to an officer who has reliable information that a suspect is in possession of a gun and uses deadly force when he, reasonably and in good faith believes, that the individual is reaching for the gun and the officer fears for his safety. *Fernandez v. Leonard*, 784 F.2d 1209 (1st Cir.1986)(Police officer who shot unarmed kidnapped victim during the course of apprehending the kidnappers was not entitled to qualified immunity); *Hilaire v. City of Laconia*, 71 F.3d 20, 28 (1st Cir.1995)(Plain clothes police officer who shot a suspect, seated in an automobile, believed to be armed and reaching for a weapon during the execution of a search warrant did not violate clearly established

constitutional law on the issue of "knock and announce" for allegedly failure to identify himself as police while approaching the car. The First Circuit went on to say that "[a]s to the plaintiff's theory that there were disputed facts as to whether Detective Gunter had a reasonable belief he was acting in self-defense when he shot St. Hilaire, we, like the district court, see no such dispute. See 885 F.Supp. at 356-57. The judgment Detective Gunter made in that split second was at the very least reasonable, and it is not the role of the court to second-guess the decision."); _Landol-Rivera v. Cruz Cosme_, 906 F.2d 791 (1st Cir.1990)(The First Circuit found there was no Fourth Amendment seizure of hostage who was in grasp of armed robber was inadvertently shot by police); _Roy v. Inhabitants of the City of Lewiston_, 42 F.3d 691 (1st Cir. 1994)(Officer's actions of shooting individual was objectively reasonable and was, therefore entitled to qualified immunity); _Napier v. Town of Windham_, 187 F.3d 177 (1st Cir.1999)(First Circuit found that two officers' independent firing of shots at suspect were not objectively unreasonable and, therefore, were entitled to qualified immunity as a bar to the §1983 action. The First Circuit ruled that the standard employed by the magistrate in evaluating the plaintiff's §1983 claim and the qualified immunity defense (i.e. that a "jury could not find that [the police officer's] conduct was so deficient that no reasonable officer could have made the same choice under the circumstances." 187 F.3d at 183.

Even the United States Supreme Court[14] did not provide clear guidance to Trooper Moynihan on this issue. See _Roy v. Inhabitants of the City of Lewiston_, 42 F.3d

---

[14] In 2004, the United States Supreme Court issued the decision of _Brosseau v. Haugen_, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) holding that "it was not clearly established, in a particularized sense, that officer violated Fourth Amendment's deadly-force standards by shooting suspect as he fled in vehicle, given risk posed to persons in immediate area."

691 (1st Cir. 1994). Rather, "the Supreme Court's standard of reasonableness is comparatively generous to police in cases where potential danger, emergency conditions or other exigent circumstances are present. In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court said that the 'calculus of reasonableness' must make 'allowance' for the need of police officers 'to make split second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'" *Roy*, 42 F.3d at 695. Commenting on the Supreme Court's interpretation of this area of law, the *Roy* Court explained:

> What these precedents dictate is this: whether substantive liability or qualified immunity is at issue, the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. Decisions from this circuit and other circuits are consistent with that view. And in close cases, a jury does not get automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently."
>
> ***
>
> ...[W]e think that the district court [properly granted summary judgment on the section 1983 claim in favor of Whalen [the officer]. Perhaps a jury could rationally have found that Whalen could have done a better job; but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as Whalen-in circumstances that were assuredly 'tense, uncertain and rapidly evolving...' *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872. Put differently, Whalen's actions, even if mistaken, were not unconstitutional.

*Id*.

The Defendants submit that in this case, similar to *Brosseau v. Haugen*, "it was not clearly established, in a particularized sense, that an officer violated Fourth Amendment's deadly-force standards by shooting suspect" believed to have a .22 or .25 caliber gun in his car and was thought to be retrieving it during a car stop. The First Circuit cases prior to June 2002 provide no guidance on this issue to a police officer. At

the time of the shooting, Trooper Moynihan had been informed by the Woonsocket Police Department that the occupants of this very car had been brandishing a .22 or .25 caliber gun less than an hour before and to use caution. Even if one assumes to be true Jenkins' allegation that he pulled his hand in because he was instructed to unlock the door, Trooper Moynihan has stated from his vantage point that Jenkins reach down towards the driver's side door panel, that he lost sight of Jenkins' hand, believed Jenkins was reaching for the gun detailed in the earlier police broadcast, feared for his own safety and shot once.[15] This statement is uncontradicted. All this happened in a split-second as even Jenkins admits that it took only *a minute* from the time he stopped his car until he was shot. A jury could not find that Trooper Moynihan's conduct was so deficient that no reasonable officer could have made the same choice as he did in circumstances that were assuredly 'tense, uncertain and rapidly evolving…". As the *Roy* Court stated, "a jury does not get automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." The excessive force claim against Trooper Moynihan should be dismissed because Jenkins has failed to demonstrate the second prong of the qualified immunity analysis; namely, that on June 25, 2002, Trooper Moynihan should have reasonably understood that his conduct violated clearly established law.

---

[15] The fact that it was later determined that Jenkins was unarmed and there wasn't a gun in his vehicle is not relevant to this analysis. *See* *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir.2005); *Sherrold v. Berry*, 856 F.2d 802, 807 (7th Cir.1988). The qualified immunity analysis is conducted based on the information known to the police officer at the time.

Jenkins' excessive force claim must also fail because the doctrine of immunity protects an officer from liability where he reasonably, but mistakenly, perceives the amount of force necessary or the underlying facts. As explained in _Saucier_:

> The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in _Anderson_. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, _Anderson_ still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable to excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

533 U.S. at 206, 121 S.Ct. at 2158-59. See also, _Gooden v. Howard County_, 954 F.2d 960, 965-66 (4th Cir.1992)(The Fourth Circuit, sitting *en banc*, held that notwithstanding three varying accounts by witnesses as to what had transpired on the evening at issue, the officers were entitled to qualified immunity. The Fourth Circuit explained that "[i]n cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place. It will nearly always be the case that witnesses to a crime differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced. Citation omitted. However, "an arrest is not unlawful merely because the information on which it is based is wrong." Citation omitted.

Instead, "in determining 'the information the ... officers possessed,' *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040, the court must determine what the police reasonably perceived the reality to be." Citation omitted).

In this case, Trooper Moynihan is entitled to qualified immunity for Jenkins' excessive force claim regarding the officer's discharge of his sidearm. Trooper Moynihan was confronted with an armed threat as reported to them through the Woonsocket Police Department. The Woonsocket Police Department reported that a green Ford Explorer, license plate AARONJ, with deep tinted windows, was carrying two black males, that they had received two incident reports about a possible assault with a dangerous weapon, and to use caution, as there was a possible handgun in the vehicle. The credibility of the report was additionally substantiated by the detailed description of the gun, i.e., a silver or a blue small—caliber handgun, possibly a .25 or a .22 automatic. Jenkins' car window was only lowered approximately ten (10) inches. Even assuming the facts as alleged by Jenkins to be true, that Trooper Moynihan instructed him to unlock his door, this does not defeat the defense of qualified immunity. Trooper Moynihan indicated that from his vantage point he believed that Jenkins was reaching down towards the driver's side door panel, that he lost sight of Jenkins' hand, believed Jenkins was reaching for the gun, feared for his safety and discharged his weapon one time. There is no evidence or witnesses that can dispute what Trooper Moynihan saw from his vantage point. The Court should not permit the defense of qualified immunity to be so easily discarded because Jenkins may raise some speculative, self-serving statement. Approximately one minute transpired between the time when Jenkins' pulled his vehicle to the side of the road until he was shot. It was an assuredly 'tense, uncertain and rapidly

evolving' minute, *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872. Trooper Moynihan's actions, even if mistaken, were not unconstitutional, unreasonable, "plainly incompetent nor "clearly proscribed." Roy, 42 F.3d at 696. Wherefore, Trooper Moynihan is entitled to qualified immunity as a bar to Jenkins' excessive force claim.

**v. Search of Jenkins' Car**

The established constitutional law permits police officers to "search ... the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably 'warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1048, 103 S.Ct 3469, 3481, 77 L.Ed.2d 1201, ____ (1983) "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of other was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct., at 1883. If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested." *Id.* The *Long* Court reasoned that an individual may break away from the brief control of the police officer and retrieve a weapon from his vehicle. *Long*, 463 U.S. at 1051, 103 S.Ct. at 3482. Moreover, this same individual will be returning to his vehicle and, thus have access to weapons, if he was not placed under arrest. 463 U.S. at 1052, 103 S.Ct. at 3482. "This limited search of the vehicle for weapons is permitted even though the occupants had been secured and taken to the rear of the vehicle." *United States v. Taylor*, 162 F.3d 12. see id (long) at 1051-52, 103 S.Ct. 3469 (holding that officers who searched

passenger compartment of stopped car for weapons acted reasonably even though suspect was under officers' control at the time of the search)."

The facts of this case would have lead any objectively reasonable police officer to conduct a cursory search of the passenger compartment of Jenkins' vehicle for weapons. The uncontradicted evidence demonstrates that Troopers Moynihan and Borek performed such a limited search for their safety and the safety of the surrounding public. Accordingly, there is no constitutional violation.

***State Claims***

The existence of reasonable and the application of qualified immunity defeat Plaintiff Jenkins' state claims. Wherefore, Counts I, II and III should be dismissed.

Defendants submit that qualified immunity is a bar to Plaintiff's state tort claims. The First Circuit in *Hatch v. Town of Middletown, et als.*, 311 F.3d 83 (1st Cir.2002) ruled that qualified immunity was available to state officers defending claims under Rhode Island law, despite there being no decision from the Rhode Island Supreme Court on point. The *Hatch* Court based its decision on the Rhode Island Supreme Court's decisions in *Pontbriand v. Sundlun*, 699 A.2d 856 (R.I.1997) and *Ensey v. Culhane*, 727 A.2d 687 (R.I.1997). A thorough analysis of the application of qualified immunity to the State claims is set forth by Judge Torres in the *Jennings* case.

**i. Rhode Island Constitution**

Plaintiff Jenkins claims at Count V that his rights to be free from unwarranted search and seizures provided to him by Article I, Section 6 of the Rhode Island Constitution were violated. First, Plaintiff does not have a remedy under the Rhode Island Constitution where Plaintiff has sought to pursue his Fourth Amendment

allegations under the Federal provisions. _Folan v. State/Department of Children, Youth & Families_, 723 A.2d 287, 292 (R.I. 1999). Secondly, these claims are based on the same set of facts and theories asserted by Jenkins under federal law. Defendants submit that for the reasons previously set forth in response to the federal claims, their stop, search and seizure of Jenkins were all supported by reasonable suspicion thereby defeating this claim. Moreover, Troopers Moynihan and Borek acted as any objectively reasonable officer would have done under the same circumstances and, as such, are entitled to qualified immunity as a bar to this claim.

Wherefore, Defendants pray that Count V is denied and dismissed.

**ii. Negligence**

In Count One of his Complaint, Jenkins asserts a general claim negligence against Defendants; however he does not state with any specificity what acts or omissions he claims support this claim.[16] Jenkins has failed to establish any negligence in the selection, training, supervision and discipline of Troopers Moynihan or Borek relative to the events of June 25, 2002 or the "proper manner in which to effectuate a lawful search, seizure and arrest as well as how to employ force when effectuating a nonviolent arrest." See Plaintiff's Amended Complaint at ¶ 34. Moreover, Plaintiff has failed to set forth any evidence that would support a claim against the State of Rhode Island on a theory of respondeat superior. Lastly, any such claim of negligence would fail as: (1) Troopers Moynihan and Borek's search, seizure and investigatory stop of Jenkins was supported by reasonable suspicion; (2) objectively reasonable officers would have responded the

[16] Count I provides "Defendants, by their individual and concerted actions and/or omissions, including but not limited to those described herein, breached the duty of car owed to Plaintiff thereby causing Plaintiff to sustain reasonably foreseeable harm and damages as aforesaid."

same and, therefore are entitled to qualified immunity and (3) the defendants were performing discretionary public functions and, thus, such claims are barred by the public duty doctrine. Therefore, Count I should be dismissed.

**iii. Battery**

At Count III Jenkins' asserts a claim based on the theory of battery. Defendants submit that qualified immunity is a bar to this claim. Defendants' incorporate by reference their argument addressing Plaintiff's excessive force claims. Accordingly, Defendants pray that this Court deny and dismiss Count Three.

## V. CONCLUSION

Reasonable suspicion existed on June 25, 2002 to stop Jenkins in response to a "be on the look out" announcement from the Woonsocket Police Department and probable cause existed for his search and seizure. The existence of probable cause and the application of the doctrine of qualified immunity defeat Jenkins' claims as a matter of law. Wherefore, Defendants pray that this Court grant their motion for summary judgment.

Respectfully Submitted,

DEFENDANTS

By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Brenda D. Baum (5184)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016

## CERTIFICATION

I hereby certify that on this 10th day of May 2006 a true copy of the within Memorandum of Law in Support of the Defendants' Motion for Summary Judgment was mailed to:

V. Edward Formisano, Esquire
Sinapi, Formisano & Company
100 Midway Place, Suite 1
Cranston, RI 02920