**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **EMANUEL JENKINS** | : | |
| | : | |
| **v.** | : | **C.A. NO: 04-453S** |
| | : | |
| **STATE OF RHODE ISLAND,** | : | |
| **State Police Department,** | : | |
| **STEVEN M. PARE, individually and in** | : | |
| **his official capacity as Superintendent of** | : | |
| **the Rhode Island State Police,** | : | |
| **MATTHEW MOYNIHAN individually** | : | |
| **and in his official capacity as a state** | : | |
| **trooper employed by the State of Rhode** | : | |
| **Island, Rhode Island State Police,** | : | |
| **DEREK BOREK, individually and in his** | : | |
| **official capacity as a state trooper** | : | |
| **employed by the State of Rhode Island,** | : | |
| **Rhode Island State Police** | : | |

# DEFENDANTS' PRETRIAL MEMORANDUM

## I. INTRODUCTION

This matter is before this Honorable Court on Plaintiff's Complaint alleging a Fourth Amendment seizure violation under 42 U.S.C. §1983 and corresponding state constitutional and tort claims. Defendant Matthew Moynihan is a state trooper with the Rhode Island State Police and was at all times relevant to this complaint. The Defendant State of Rhode Island is being sued under a negligence theory.

## II. DEFENDANTS' CASE

It has already been established by the Court in ruling on Defendants' Motion for Summary Judgment that: (1) "to the extent that Plaintiff seeks damages or declaratory relief against the State of Rhode Island or Rhode Island State Trooper Matthew

Moynihan in his official capacity under 42 U.S. C. §1983" the claim is denied as a matter of law and (2) [t]o the extent Plaintiff has advised the Court that he does not press an objection to Defendants' Motion for Summary Judgment on the issues of constitutionality of the stop and approach of Plaintiff's vehicle, the handcuffing of Plaintiff on the ground, the pat down of Plaintiff, the removal of Plaintiff from his vehicle and stepping on his back, and the search of Plaintiff's vehicle" the claims are denied as a matter of law.

The evidence will show that Trooper Moynihan's discharge of his weapon on June 25, 2002 was a permissible use of force and objectively reasonable based on the facts known to him at the time. Defendant Moynihan is, at the very least, entitled to qualified immunity with respect to the approach of Jenkins' vehicle and discharge of his weapon as a bar to this suit. Similarly, the claims against the Defendant State of Rhode Island should be dismissed.

**Factual Background**

On June 25, 2002 Woonsocket Police Department's dispatchers received two (2) phone calls indicating that there were two black males in a green SUV bearing license plate AARONJ and that they had a gun. Woonsocket Police documented that one of the callers reported that the individuals in this vehicle had flashed a handgun in a threatening manner to an employee of a barbershop. In response, Woonsocket Police issued a BOLO broadcasted over the Inter-City network with attention to North Smithfield, Lincoln, Cumberland and the Rhode Island State Police. The radio broadcasts stated:

> Woonsocket P.D. to surrounding communities: Please be on the lookout for Rhode Island vanity plate AARONJ, A-Alpha, A-Alpha, R-Romeo, O-Oscar, N-November, J-Juliette. AARONJ. It's a green SUV, possibly a ninety (static) '97 Ford SUV, color green, possibly an Explorer.

> Described as a hunter green SUV with deep tinted windows. Use caution. Possible handgun was shown. At this time we're entertaining a complaint – at this time we're entertaining a complaint for ADW. Again, it's a silver or a blue small—caliber handgun. Two black males in the vehicle, deep tinted windows, unknown additional occupants. A twen—possibly a .25 or a .22 auto. Again, its AARONJ, green SUV. Use caution if contacted. Woonsocket is going to be cleared at 1611.
>
> ***
>
> …(unintelligible) and surrounding communities: In reference to the BOLO on AARONJ, that's Rhode Island vanity plate AARONJ, '97 Ford Explorer, color green. At this time we do not have a complaint; however we did take an incident report from two separate sources that did confirm that they did see a --- a handgun. Again, use caution if the vehicle's located. There is no active complaint for ADW; however, we do had reason to believe there is a handgun inside the vehicle. Woonsocket's cleared at 16:18.

The State Police acknowledged receipt of the BOLO and transmitted the information to its cruisers out of the Lincoln and Chepachet barracks. After hearing the broadcast, Trooper Moynihan confirmed through the computer in his cruiser that the vehicle plate "AARONJ" matched the description of the vehicle. Soon thereafter, Trooper Moynihan saw the green Ford Explorer bearing the plates AARONJ traveling on Route 146 south and radioed the information to the R.I. State Police barracks. Trooper Moynihan advised that he would not stop the vehicle until back up had arrived. While following the vehicle, Trooper Moynihan confirmed there were two (2) African American males in the vehicle.

Trooper Derek Borek responded as back up and both troopers followed the green Ford Explorer as it exited at the Thurbers Avenue exit in Providence. Trooper Moynihan activated his overhead lights and siren. The green Ford Explorer pulled to the right hand side of Thurbers Avenue.[1] It was approximately 5:00 p.m. on a workday, with traffic proceeding in both directions and on Eddy Street, perpendicular thereto. Trooper

[1] Both Trooper Moynihan and Borek were in marked State Police cruisers and were in uniform.

Moynihan parked his cruiser to the left rear of the Explorer and Trooper Borek pulled his cruiser behind it. Trooper Moynihan left his vehicle with his sidearm drawn and took up a position behind his cruiser. Trooper Borek retrieved a shotgun from the trunk and similarly took cover behind his cruiser. Trooper Moynihan yelled to the occupants of the Explorer to place their hands out the window. They complied. ***Id***.[2] After confirming that Trooper Borek was covering the passenger, Trooper Moynihan cautiously approached the rear of the Explorer. He continued to instruct the occupants to "keep your hands up" and "keep your hands out the window. With his weapon in his left hand, Trooper Moynihan reached out with his right hand to open the driver's door. Trooper Moynihan did not attempt or try to open the driver's door at this time. Jenkins pulled his two hands in from the window. Trooper Moynihan immediately repeated the command to keep the hands up once Jenkins pulled them in and Jenkins did not comply. Jenkins' hands went down to a position that Trooper Moynihan could no longer see them and he believed that Jenkins was reaching for a gun. Trooper Moynihan shot once into the Explorer. Jenkins's hands immediately came up into view. Trooper Moynihan opened the door, removed Jenkins from the Explorer and placed him on the ground. After a brief pat down for weapons, Trooper Moynihan placed Jenkins in handcuffs. After the passenger was removed from the Explorer and handcuffed, a rescue was called as Jenkins had been shot in the leg. Jenkins' estimates that only one (1) minute elapsed from the time he stopped his vehicle until he was shot. Troopers Moynihan and Borek did a cursory search of the passenger compartment of the Explorer to check for weapons.

[2] Trooper Borek could not observe the driver from his vantage point because of the heavy tint on the windows.

Jenkins was transported by rescue to Rhode Island Hospital, treated and released into State Police custody. Jenkins was arrested and charged with driving on a suspended license. He was later released after bail was posted.

## III. LIST OF WITNESSES AND BRIEF SUMMARY OF HIS OR HER TESTIMONY

The Defendants reserve the right to present the following witnesses:

1. Trooper Derek Borek

Trooper Borek is expected to testify regarding his participation and observations of the radio transmissions, the stop of Plaintiff's vehicle on June 25, 2002, the transport and arrest of Howard Soares to the State Police Barracks. Trooper Borek may also testify regarding his experience and teaching lessons of motor vehicle stops as the officer safety instructor of the Rhode Island State Police and at the most recent RISP academy.

2. Trooper Matthew Moynihan

Trooper Moynihan is expected to testify regarding his participation and observations of the radio transmissions, the June 25, 2002 stop of Plaintiff's vehicle, the discharge of his weapon in response to Plaintiff's sudden action of pulling his hands back into the vehicle after being ordered to keep his hands up, the removal and handcuffing of Plaintiff and his passenger. Trooper Moynihan may also testify regarding the training he received and completion of paperwork and interviews after the June 25, 2002 stop of Plaintiff's vehicle.

3. Manual Sousa

Mr. Sousa may be called to testify regarding his observations of the stop of Plaintiff's vehicle on June 25, 2002.

4. Richard Mulligan

Mr. Mulligan was a dispatcher for the Woonsocket Police Department in 2002. Dispatcher Mulligan may testify regarding several calls he received on June 25, 2002 relating to two male occupants of a green SUV with the registration number "AARONJ". The callers indicated that a male in the car was making threats to someone at Universal Cuts and that he had a gun. Dispatcher Mulligan has personal knowledge regarding how the information is put in the Department's computer, the reports generated and what he does with the calls and information after receiving them.

5. Keith McCarthy

Mr. McCarthy was a dispatcher at the Woonsocket Police Department on June 25, 2002. Dispatcher McCarthy may testify regarding the calls received by the Woonsocket Police Department regarding an individual in a green Ford with the license plate AARONJ with a gun in the area of Universal Cuts

6. Eric Horsley

Mr. Horsley may be called to testify regarding his personal interaction with Plaintiff on June 25, 2002. Mr. Horsley observed Plaintiff to have a gun in the vehicle with him on that date. Mr. Horsley had conversations with several people, one being Ms. Ekwegh, relating his conversation with Plaintiff. Mr. Horsley has knowledge regarding the relationship between Plaintiff and Dwight Withee.

7. Morgan Rock

Ms. Rock may be called to testify regarding her observations to the June 25, 2002 stop of the vehicle Plaintiff was driving.

8. <u>Howard Soares</u>

Mr. Soares was a passenger in Plaintiff's car on June 25, 2002 and may be called to testify regarding his statement to the police.

9. <u>James Stephenson</u>

Mr. Stephenson may be called to testify regarding his observations to the stop of Plaintiff's vehicle on June 25, 2002.

10. <u>Lawrence Trombetti</u>

Mr. Trombetti may be called to testify regarding his observations to the stop of Plaintiff's vehicle on June 25, 2002.

11. <u>Captain. Swanberg</u>

Captain. Swanberg may testify regarding his has personal knowledge as to the radio transmissions on June 25, 2002 and personal observations when he arrived on the scene. Captain Swanberg may also be called to testify regarding his experience and teaching lessons of motor vehicle stops as the officer safety instructor of the Rhode Island State Police and its Academy classes.

12. <u>Corporal John P. A'Vant</u>

Corporal John P. A'Vant may testify regarding his interviews of Dispatcher Mulligan, Dispatcher Keith McCarthy, Brandi Ekwegh, Talisha Harmon, Eric Horsley, Kesha Raczkowski, Jermaine Robinson and Dwight Withee and can attest to the authenticity of the tape recorded interviews.

13. <u>Trooper Benjamin Barney</u>

Trooper Benjamin Barney may testify regarding his interviews of Dispatcher Mulligan, Brandi Ekwegh, Talisha Harmon, Eric Horsley, Kesha Raczkowski, Jermaine

Robinson and Dwight Withee and can attest to the authenticity of the tape recorded interviews.

14. Corporal James Dougherty

Corporal James Dougherty may testify regarding his interviews of Emanuel Jenkins and Howard Soares and can attest to the authenticity of the tape-recorded interviews.

15. Trooper Dennis Fleming

Trooper Dennis Fleming may testify regarding his interviews of Jacqueline Jenkins and Lawrence Trombetti and can attest to the authenticity of the tape recorded interviews.

16. Trooper Christopher DiComitis

Trooper Christopher DiComitis may testify regarding interviews of Morgan Rock and Lawrence Trombetti and can attest to the authenticity of the tape recorded interviews.

17. Lieutenant Leroy V. Rose, Jr

Lieutenant Leroy V. Rose, Jr. may testify regarding arriving on the scene to investigate the June 25, 2002 incident as part of the Criminal Identification Unit of the Rhode Island State Police, processing the Ford Explorer that Plaintiff was driving at the Rhode Island State Police Annex Building and transporting items to the Rhode Island State Crime Laboratory and Department of Health Laboratory for testing.

18. Lieutenant Kevin Hopkins

Lieutenant Kevin Hopkins may testify regarding his review of statements and facts surrounding June 25, 2002 stop of Plaintiff's vehicle, including statements, etc., preparation of the police narrative of the incident and presented the investigation package

to the Attorney General's Office for review of the use of force to determine whether there were criminal implications, the interview of Trooper Borek and Trooper Moynihan and can attest to the authenticity of the tape recorded interviews. Lt. Hopkins may also testify to authenticate the surveillance video from White Fuel Company.

19. Trooper Diane Dougherty

Trooper Diane Dougherty may testify regarding her review of statements and facts surrounding June 25, 2002 stop of Plaintiff's vehicle, including statements, etc. and interviews of Trooper Borek, Trooper Moynihan, Jacqueline Jenkins and James Stephenson and can attest to the authenticity of the tape recorded interviews.

20. Lieutenant. David Palmer

Lieutenant. Palmer may testify regarding his interview of Howard Soares on or about June 25, 2002 and can attest to the authenticity of the tape recorded interviews.

21. Michael Brave, J.D., M.S., C.L.S., C.L.E.T., C.P.S., C.S.T.

Mr. Brave may be called to testify as an expert as to the events of June 25, 2002 and police procedures.

22. Representative of White Fuel Company

The representative may testify to authenticate the surveillance video from White Fuel Company

23. Keeper of the Records of the Pawtucket Police Department

The Keeper of the records is expected to testify to the authenticity of police reports of the June 25, 2002 incident.

24. Keeper of the Records of the Woonsocket Police Department

The Keeper of the records is expected to testify to the authenticity of police reports of incident # 01-9119-OF and Narrative of Patrolman Kevin Greenough.

## IV. MEMORANDUM OF SUPPORTING LAW AND CITATIONS OF AUTHORITY

**Qualified Immunity in 42 U.S.C. §1983 Cases**

For personal liability under 42 U.S.C. §1983 to attach, the law requires a "more particularized" showing than in other actions: namely, that "unlawfulness" under the Constitution be "apparent" based on preexisting law. Anderson v. Creighton, 483 U.S. 635, 640 (1987); Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001). The doctrine of qualified immunity provides an "escape hatch", Camilo-Robles v. Zapata, 175 F.3d 41 (1st Cir. 1999), precluding suits for money damages under §1983 against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982). The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial – of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S. at 816. Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000), citing Malley v. Briggs, 475 U.S. 335, 341, 343 (1986). Without proper immunity for reasonable ***mis***interpretation, governmental actors would be placed in the untenable position of facing the burdens of litigation and the risk of liability for guessing incorrectly when the constitutional provision itself provides little guidance. The qualified immunity doctrine exists to protect objectively reasonable decisions from becoming an obstacle to the efficient functioning of state government. The Supreme Court has never held that all

decisions made by government officials be correct in all respects—simply that they be objectively reasonable. Implicit in the idea that officials have some immunity for their official acts is a recognition that they may err. The concept of immunity assumes this and goes on to recognize that it is better to risk some error and possible injury from such error than not to decide or act at all. Scheuer v. Rhodes, 416 U.S. 232 (1974). The law has sought to provide a measure of deterrence against patent violations of recognized constitutional rights, while avoiding the kind of zealousness that would hamper effective decision-making by competent officers acting in a reasonable manner.

The doctrine of qualified immunity rests on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; and (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good. Scheuer v. Rhodes, 416 U.S. at 240.

In applying the qualified immunity defense to a claim brought under 42 U.S.C. § 1983, the Court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right. ***Abreu-Guzman v. Ford***, 241 F.3d 69, 73 (1st Cir.2001)(quoting, 562 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). If there was no such deprivation, then the claim must be dismissed. If a constitutional violation is found, "the court must 'proceed to determine whether the right was clearly established at the time of the alleged violation'". ***Id***. (citations omitted). It is not enough for the constitutional right to be "clearly established" at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood

that his conduct violated clearly established law. Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998).

It is only if the Court finds that a constitutional right was violated and that right was clearly established at the time, will the Court address the particular conduct in question. ***Abreu-Guzman***, 241 F.3d at 73. If the Court reaches this third step, then it analyzes the facts to determine whether an objectively reasonable officer would have understood that his conduct violated a clearly established constitutional right. ***Id***. "In the best of circumstances, '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" ***Savard***, 338 F.3d at 29(citing ***Bell***, 441 U.S. at 559). "Indeed, the Supreme Court itself has acknowledged, in a qualified immunity case, 'the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment.'" ***Id***. (citing ***Anderson***, 483 U.S. at 644). "The law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." ***Id***. at 30.

The Defendants submit that qualified immunity bars Jenkins' search and seizure claims. Plaintiff has failed to establish a violation of clearly established constitutional rights. Moreover, Trooper Moynihan's actions were objectively reasonable based on the facts known to them at the time of the stop on June 25, 2002. Wherefore, Jenkins' Amended Complaint should be denied and dismissed.

***Plaintiff's Seizure Claim***

"The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, __(1985). In this case, Plaintiff's seizure claim is premised on his allegation that Trooper Moynihan used excessive force when he discharged his weapon striking him in the leg.

"[C]laims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's 'objective reasonableness standard," not under the substantive due process principles." *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Graham*, 490 U.S. at 388, 394). "The distinction between excessive force and permissible force turns on whether the level of force used was reasonable and the test is whether, under the circumstances confronting the defendant at the time that he acted, 'no objectively reasonable officer would have used the same degree of force. *Isom v. Town of Warren*, 360 F.3d 7,1 2 (1st Cir. 2004); *see Napier v. Town of Wyndham*, 187 F.3d 177, 183 (1stCir. 1999)(''The relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances.'(internal quotation omitted))." *Jenning v. Pare*, 2005 WL 2043945 (D.R.I. 2005); appeal pending before the First Circuit, 05-2522.

The force must be objectively reasonable under the totality of the circumstances. *Graham*, 109 S.Ct. at 1873. The issue is "whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them without regard to their underlying intent or motivation…" *Id*. at 1872. Factors to consider when determining whether the force used was objectively reasonable include the severity of the

crime at issue, whether the suspect posed a threat to the safety of officers or others, and whether the arrestee actively resisted arrest or attempted to avoid arrest. *Id.* The plaintiff has the burden of demonstrating that excessive force was used. ***Isom***, 360 F.3d at 10. However, in analyzing the facts, courts should be mindful that ".. 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation, and the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective," ***Graham*** 109 S.Ct. at 1865. ***Saucier***, 533 U.S. at 205, 121 S.Ct at 2158. The Court should be cautious to avoid a "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene." Id. "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. ***Saucier***, 533 U.S. at 209, 121 S.Ct. at 2151. Moreover, if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. ***Saucier***, 533 US at 205, 121 S.Ct at 2158.

A court's excessive force analysis is distinguishable from a qualified immunity analysis. ***Saucier***, 533 U.S. at 204. A separate inquiry must occur when an officer raises the defense of qualified immunity to a civil claim of excessive force. As the ***Saucier*** Court explained:

> The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's

> mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

***Saucier***, 533 U.S. at 205, 121 S.Ct. at 205. "Qualified immunity operates in this case, just as it does in others, to protect officers from the sometimes 'hazy border between excessive force and acceptable force,' ***Priester v. Riveira Beach***, 20 F.3d 919, 926-927 (11th Cir.2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." ***Saucier***, 533 U.S. at 206, 121 S.Ct. at 2158. An officer is entitled to qualified immunity if they have reasonable, but mistaken, beliefs as to the facts establishing the amount of force necessary. ***Saucier***, 533 U.S. at 206, 121 S.Ct. at 2158.

A court should be mindful in addressing excessive force claims that a practice of denying a summary judgment motion "any time a material issue of fact remains on an excessive force claim – could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" ***Saucier***, 533 U.S. 194, 202, 121 S.Ct. 2151, 2157, 150 L.Ed.2d 272, __ (2001). The First Circuit explained that "[p]erhaps a jury could rationally have found that [the officer] could have done a better job; but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as [the officer] – in circumstances that were assuredly 'tense, uncertain, and rapidly evolving…" ***Roy v. Inhabitants of the City of Lewiston***, 42 F.3d 691, 695 (1st Cir.1994). See also ***Vaughn v. Cox***, 316 F.3d 1210 (11th Cir.2003)(The Eleventh Circuit ruled that an officer was entitled to qualified immunity on a claim of excessive force under 42 U.S.C. §1983 even though a reasonable jury, under the plaintiff's version of the events, would find the officer's conduct violated the Fourth Amendment); ***Weaver v. Hanna***, 122 F.Supp.2d 1(D.C.Cir.2000)(Qualified immunity

barred excessive force claims against officers and Judge held that "[t]he dispute of facts here – whether plaintiff was "slammed" to the ground or placed him on the ground – is not for a jury."); ***Palmer v. Unified Government of Wyandotte County/Kansas City***, 72 F.Supp.2d 1237 (D.KS1999). [3]

Trooper Moynihan's discharge of his weapon is similarly protected by the doctrine of qualified immunity based on two prongs of this legal test. First, the case law demonstrates that Trooper Moynihan's actions did not violate a clearly established right on June 25, 2002. Second, Trooper Moynihan's actions were objectively reasonable based on the facts known to him on June 25, 2002. Even assuming Jenkins' version of the facts that he pulled his hand in to merely unlock his door, Trooper Moynihan would be entitled to qualified immunity as he had a reasonable, but mistaken, belief as to the facts establishing the amount of force necessary.

First, this Court must determine whether the right was clearly established at the time of the incident on June 25, 2002 (i.e., "whether the officer had fair notice that his conduct was unlawful." ***Jennings***, 2005 WL 2043945 at p.8 (Pending appeal at First Circuit, No. 05-2522), (*citing* *Brousseau v. Haugen*, __ U.S.__, 125 S.Ct. 596, 601, 160 L.Ed.2d 583 (2004)). As previously stated, the backdrop for conducting this analysis is

---

[3] *Saucier*, *supra*. (Officer was entitled to qualified immunity to Plaintiff's claim of excessive force alleging a "gratuitous violent shove" into police van); ***Palmer v. Unified Government of Wyandotte County/Kansas City***, 72 F.Supp.2d 1237 (D.KS1999)(Police officers were entitled to qualified immunity as a bar to Plaintiff's excessive force claim where he alleged that he cooperated but officers knocked keys out of his hand injuring his wrist, placed in a "choke hold" and was handcuffed so tightly that it cut into his skin.); ***Dean v. City of Worcester***, 924 F.2d 364 (1st Cir.1991)(Police, who mistakenly identified plaintiff as an escaped felon, were entitled to qualified immunity to Plaintiff's claim of excessive force where it was alleged that the officers pushed him to the sidewalk causing his face to hit the sidewalk, placed a gun to his ear and threatened to blow his head off, plaintiff felt a knee to his back and a slight kicking at his feet, was tightly handcuffed and pushed against a wall suffering a cut to his scalp.)

not in the abstract, but rather, in the specific context – whether in the circumstances faced by the officer, he should have reasonably understood that his conduct violated clearly established law." ***Berthiaume***, 142 F.3d at 15. In an excessive force case, unless it is obvious that the force used was excessive, the Court must look to prior case law to determine whether it was clearly established that the Constitution prohibited the type of conduct in which the officer engaged under the specific circumstances confronting the officer. (*See* ***Brosseau***, 125 S.Ct. at 599)". ***Jennings*** at p.9. Similar to the reasoning in ***Jennings***, under the facts of this case it is not obvious that Trooper Moynihan used excessive force; this is one of those "close cases" in which there is a "hazy border between excessive and acceptable force." ***Id***. (citations omitted).

The Defendants further submit that the law was not sufficiently established such that it would be clear to Trooper Moynihan that discharging his weapon one time based on the reasonable belief that Jenkins was reaching for the .22 or .25 caliber gun that the Woonsocket Police Department broadcasted had been brandished by the occupants of this very vehicle, was a constitutional violation. The decisions of the First Circuit do not provide any clear guidance to an officer on this issue.

In ***Maiorana v. MacDonald***, 596 F.2d 1072, 1074 (1st Cir. 1979), police officers received information from informants that Anthony Maiorana (hereinafter "Maiorana") was selling guns and was involved in an armed robbery. Through the use of a listening device, the police heard a conversation between an informant and Maiorana wherein, the latter was asked whether he went back to the apartment to get his gun, which he answered in the affirmative. ***Id***. at 1076. The police officers then conducted a motor vehicle stop of the car Maiorana was in. ***Id***. Two officers approached the car from the driver's side

and two from the passenger's side, their weapons drawn, displaying their identification and shouting warnings not to move. ***Id***. The informant reached from the front seat to the back seat of the car and tried to restrain Maiorana's hands. ***Id***. A shot was fired and the informant was hit. ***Id***. One of the police officer's stated that he fired a single shot at Maiorana when he saw him reach for his waist. ***Id***. Thereafter, several officers shot into the car. Id. Maiorana died at the hospital. ***Id***. Maiorana's mother filed the 42 U.S.C. §1983 action as administratrix of her son's estate.

In granting the officers' motion for summary judgment, the district court found that:

> … there was no genuine dispute concerning the reasonableness and good faith of the officers, who the court found had grounds to believe that Maiorana was armed and dangerous and who were called upon to act decisively under the circumstances. The court characterized the plaintiff's counteraffidavits as "mostly conclusory allegations … (about) the state of mind if the officers … (and) a speculative, unsupported and self-serving analysis of the circumstances surrounding the arrest."

***Id***. In affirming the District Court's decision, the First Circuit acknowledged that "'police officers … must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office" and that an "arrest may sometimes entail the use of deadly force and that liability under §1983 will not arise if the officers involved reasonably believed in good faith that such force was necessary to protect themselves or others from death or great bodily harm." ***Id***. at 1078 (citations omitted). The First Circuit agreed with the lower court's reasoning and dismissed the suit against the officers based qualified immunity.

The Defendants submit that the First Circuit cases that follow ***Maiorana*** do not provide clear guidance to an officer who has reliable information that a suspect is in

possession of a gun and uses deadly force when he, reasonably and in good faith believes, that the individual is reaching for the gun and the officer fears for his safety. ***Fernandez v. Leonard***, 784 F.2d 1209 (1st Cir.1986)(Police officer who shot unarmed kidnapped victim during the course of apprehending the kidnappers was not entitled to qualified immunity); ***Hilaire v. City of Laconia***, 71 F.3d 20, 28 (1st Cir.1995)(Plain clothes police officer who shot a suspect, seated in an automobile, believed to be armed and reaching for a weapon during the execution of a search warrant did not violate clearly established constitutional law on the issue of "knock and announce" for allegedly failure to identify himself as police while approaching the car. The First Circuit went on to say that "[a]s to the plaintiff's theory that there were disputed facts as to whether Detective Gunter had a reasonable belief he was acting in self-defense when he shot St. Hilaire, we, like the district court, see no such dispute. See 885 F.Supp. at 356-57. The judgment Detective Gunter made in that split second was at the very least reasonable, and it is not the role of the court to second-guess the decision."); ***Landol-Rivera v. Cruz Cosme***, 906 F.2d 791 (1st Cir.1990)(The First Circuit found there was no Fourth Amendment seizure of hostage who was in grasp of armed robber was inadvertently shot by police); ***Roy v. Inhabitants of the City of Lewiston***, 42 F.3d 691 (1st Cir. 1994)(Officer's actions of shooting individual was objectively reasonable and was, therefore entitled to qualified immunity); ***Napier v. Town of Windham***, 187 F.3d 177 (1st Cir.1999)(First Circuit found that two officers' independent firing of shots at suspect were not objectively unreasonable and, therefore, were entitled to qualified immunity as a bar to the §1983 action. The First Circuit ruled that the standard employed by the magistrate in evaluating the plaintiff's §1983 claim and the qualified immunity defense (i.e. that a "jury could not find that [the

police officer's] conduct was so deficient that no reasonable officer could have made the same choice under the circumstances." 187 F.3d at 183.

Even the United States Supreme Court[4] did not provide clear guidance to Trooper Moynihan on this issue. See ***Roy v. Inhabitants of the City of Lewiston***, 42 F.3d 691 (1st Cir. 1994). Rather, "the Supreme Court's standard of reasonableness is comparatively generous to police in cases where potential danger, emergency conditions or other exigent circumstances are present. In ***Graham v. Connor***, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court said that the 'calculus of reasonableness' must make 'allowance' for the need of police officers 'to make split second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'" ***Roy***, 42 F.3d at 695. Commenting on the Supreme Court's interpretation of this area of law, the ***Roy*** Court explained:

> What these precedents dictate is this: whether substantive liability or qualified immunity is at issue, the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. Decisions from this circuit and other circuits are consistent with that view. And in close cases, a jury does not get automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently."
>
> ***
>
> …[W]e think that the district court [properly granted summary judgment on the section 1983 claim in favor of Whalen [the officer]. Perhaps a jury could rationally have found that Whalen could have done a better job; but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as Whalen-in circumstances that were assuredly 'tense, uncertain and rapidly

[4] In 2004, the United States Supreme Court issued the decision of ***Brosseau v. Haugen***, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) holding that "it was not clearly established, in a particularized sense, that officer violated Fourth Amendment's deadly-force standards by shooting suspect as he fled in vehicle, given risk posed to persons in immediate area."

> evolving…' ***Graham***, 490 U.S. at 397, 109 S.Ct. at 1872. Put differently, Whalen's actions, even if mistaken, were not unconstitutional.

***Id***.

The Defendants submit that in this case, similar to ***Brosseau v. Haugen***, "it was not clearly established, in a particularized sense, that an officer violated Fourth Amendment's deadly-force standards by shooting suspect" believed to have a .22 or .25 caliber gun in his car and was thought to be retrieving it during a car stop. The First Circuit cases prior to June 2002 provide no guidance on this issue to a police officer. At the time of the shooting, Trooper Moynihan had been informed by the Woonsocket Police Department that the occupants of this very car had been brandishing a .22 or .25 caliber gun less than an hour before and to use caution. Even if one assumes to be true Jenkins' allegation that he pulled his hand in because he was instructed to unlock the door, Trooper Moynihan has stated from his vantage point that Jenkins reach down towards the driver's side door panel, that he lost sight of Jenkins' hand, believed Jenkins was reaching for the gun detailed in the earlier police broadcast, feared for his own safety and shot once.[5] This statement is uncontradicted. All this happened in a split-second as even Jenkins admits that it took only ***a minute*** from the time he stopped his car until he was shot. A jury could not find that Trooper Moynihan's conduct was so deficient that no reasonable officer could have made the same choice as he did in circumstances that were assuredly 'tense, uncertain and rapidly evolving…". As the ***Roy*** Court stated, "a

---

[5] The fact that it was later determined that Jenkins was unarmed and there wasn't a gun in his vehicle is not relevant to this analysis. *See* ***Blossom v. Yarbrough***, 429 F.3d 963, 968 (10th Cir.2005); ***Sherrold v. Berry***, 856 F.2d 802, 807 (7th Cir.1988). The qualified immunity analysis is conducted based on the information known to the police officer at the time.

jury does not get automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." The excessive force claim against Trooper Moynihan should be dismissed because Jenkins has failed to demonstrate the second prong of the qualified immunity analysis; namely, that on June 25, 2002, Trooper Moynihan should have reasonably understood that his conduct violated clearly established law.

Jenkins' excessive force claim must also fail because the doctrine of immunity protects an officer from liability where he reasonably, but mistakenly, perceives the amount of force necessary or the underlying facts. As explained in ***Saucier***:

> The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in ***Anderson***. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, ***Anderson*** still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable to excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

533 U.S. at 206, 121 S.Ct. at 2158-59. See also, *Gooden v. Howard County*, 954 F.2d 960, 965-66 (4th Cir.1992)(The Fourth Circuit, sitting *en banc*, held that notwithstanding three varying accounts by witnesses as to what had transpired on the evening at issue, the officers were entitled to qualified immunity. The Fourth Circuit explained that "[i]n cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place. It will nearly always be

the case that witnesses to a crime differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced. Citation omitted. However, "an arrest is not unlawful merely because the information on which it is based is wrong." Citation omitted. Instead, "in determining 'the information the ... officers possessed,' ***Anderson***, 483 U.S. at 641, 107 S.Ct. at 3040, the court must determine what the police reasonably perceived the reality to be." Citation omitted).

In this case, Trooper Moynihan is entitled to qualified immunity for Jenkins' excessive force claim regarding the approach of his vehicle and the trooper's discharge of his sidearm. Trooper Moynihan was confronted with an armed threat as reported to them through the Woonsocket Police Department. The Woonsocket Police Department reported that a green Ford Explorer, license plate AARONJ, with deep tinted windows, was carrying two black males, that they had received two incident reports about a possible assault with a dangerous weapon, and to use caution, as there was a possible handgun in the vehicle. The credibility of the report was additionally substantiated by the detailed description of the gun, i.e., a silver or a blue small—caliber handgun, possibly a .25 or a .22 automatic. Jenkins' car window was only lowered approximately ten (10) inches. Even assuming the facts as alleged by Jenkins to be true, that Trooper Moynihan instructed him to unlock his door, this does not defeat the defense of qualified immunity. Trooper Moynihan indicated that from his vantage point he believed that Jenkins was reaching down towards the driver's side door panel, that he lost sight of Jenkins' hand,

believed Jenkins was reaching for the gun, feared for his safety and discharged his weapon one time. There is no evidence or witnesses that can dispute what Trooper Moynihan saw from his vantage point. The Court should not permit the defense of qualified immunity to be so easily discarded because Jenkins may raise some speculative, self-serving statement. Approximately one minute transpired between the time when Jenkins' pulled his vehicle to the side of the road until he was shot. It was an assuredly 'tense, uncertain and rapidly evolving' minute, ***Graham***, 490 U.S. at 397, 109 S.Ct. at 1872. Trooper Moynihan's actions, even if mistaken, were not unconstitutional, unreasonable, "plainly incompetent nor "clearly proscribed." ***Roy***, 42 F.3d at 696. Wherefore, Trooper Moynihan is entitled to qualified immunity as a bar to Jenkins' excessive force claim.

Trooper Moynihan's decision to approach the vehicle does not amount to a constitutional violation. The Plaintiff does not have a constitutional right to have a traffic stop, whether it is an unknown or high-risk stop, to be performed in any stated fashion. If stops were to be performed in a mechanical and predictable fashion in all circumstances, law enforcement would be exposed to an unreasonable and unconscionable risk of harm. The United States Supreme Court has recognized and condoned the interest of law enforcement "in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." ***Terry***, 392 U.S. at 23, 88 S.Ct. at 1881, *see also* ***Pennsylvania v. Mimms***, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); ***Michigan v. Long***, 463 U.S. 1032, 1048, 103 S.Ct 3469, 3481, 77 L.Ed.2d 1201, ____ (1983). Moreover the United States Supreme Court cautioned courts in second guessing the procedural means chosen to accomplish and

dispel suspicions in an investigatory stop in ***United States v. Sharpe***, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The Supreme Court cautioned that "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself render the search unreasonable.' Citations omitted. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." ***Sharpe***, 470 U.S. at 686-687, 105 S.Ct. at 1575-1576.

The Fourth Circuit addressed permissible safety precautions and alternatives taken by law enforcement when conducting a traffic stop of a vehicle with heavily tinted windows in ***United States v. Stanfield***, 109 F.3d 976 (4th Cir.1997); *cert. denied* 552 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997). In ***Stanfield***, three Baltimore Police officers[6] were patrolling a high crime area known for drug trafficking and observed a Pathfinder with heavily tinted windows illegally parked. 109 F.3d at 978. When the vehicle did not move, the police noticed that the driver was speaking to two (2) men in a second floor window, one of whom they recognized to be a known drug dealer. ***Id***. The officers exited their cruiser and approached the Pathfinder from both the driver and passenger sides. ***Id***. Due to the tint of the vehicle, the officers could not see into it. ***Id***. Because of the tint, one officer opened the passenger side door to see if the occupant(s) were armed or had access to weapons. ***Id***. at 978-79. The Fourth Circuit found that under the facts of this case, the limited intrusion by the officer opening the door was

[6] The officers were wearing bulletproof vests over the uniforms because of the dangerousness of their patrol. ***Id***.

outweighed by officer safety and thus, no Fourth Amendment violation existed.

In reaching its decision, the Fourth Circuit explained:

> Even where the interiors of vehicles are fully visible, "roadside encounters between the police and suspects are especially hazardous," ***Long***, 463 U.S. at 1049, 103 S.Ct. at 3481, with as many as "30% of police shootings occur[ing] when a police officer approache[s] a suspect seated in an automobile," Mimms, 434 U.S. at 110, 98 S.Ct. at 333; *see also* ***Adams v. Williams***, 407 U.S. 143, 148n.3, 92 S.Ct. 1921, 1924, n.3, 32 L.Ed.2d 612 (1972). In fact, as the Court noted recently in *Wilson,* in 1994 alone, 5,762 assaults on police officers occurred during the course of traffic pursuits or stops. *See* Wilson, 519 U.S. at ___, 117 S.Ct. at 885 (citation omitted). Thus, "it [is]'too plain for argument' " that the governmental interest in officer safety during traffic stops is substantial. *Id.* at ----, 117 S.Ct. at 885(quoting, ***Mimms***, 434 U.S. at 110, 98 S.Ct. at 333).
>
> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.* As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on him from the moment the stop was initiated. As one officer put the obvious: "If the suspect has a weapon, I might not see it until he rolls down the window. He may just shoot me through the window." If, as the Court has noted, officers face an "inordinate risk" every time they approach even a vehicle whose interior and passengers are fully visible to the officers, Mimms, 434 U.S. at 110, 98 S.Ct. at 333, the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable. In fact, it is out of recognition of just such danger that at least twenty-eight states, including Maryland, have now enacted laws either regulating or altogether prohibiting the use of tinted windows on vehicles in their states.

***Id***. at 981-982. Despite this danger, the ***Stanfield*** Court recognized the importance of not hamstringing police officers to a single prescribed manner to conduct an investigatory

stop. The ***Stanfield*** Court expounded that:

> Even if there were reasonable alternatives to allowing officers to open the door of a vehicle with heavily tinted windows in order to ascertain whether the driver is armed and whether there are other occupants in the vehicle, we would hesitate to impose them on the law enforcement community as a matter of constitutional law. As the Supreme Court has been at pains to observe, during *Terry*-type stops, officers "must make ... 'quick decision[s] as to how to protect [themselves] and others from possible danger' " at times when they are "particularly vulnerable," and thus it has "not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in [such an] encounter." ***Long***, 463 U.S. at 1052, 103 S.Ct. at 3482(quoting ***Terry***, 392 U.S. at 28, 88 S.Ct. at 1883); *see also id.* at 1052 n. 16, 103 S.Ct. at 3482 n.16. That is, the Court has scrupulously avoided substituting its judgment for that of law enforcement as to how best to ensure officer safety.
>
> With that said, however, we are at a loss to identify an acceptable alternative to a rule such as that we suggest would be justified. Upon a moment's reflection, it becomes apparent that neither requiring officers (while in their cruisers or as they proceed toward the stopped vehicle) instead to order occupants to exit the vehicle nor requiring that they order that all of the vehicle's doors be opened, represents an acceptable, or even a reasonable, alternative. *To require officers to order the vehicle's occupants to exit as the officers approach the stopped vehicle exposes the officers to the very danger to which we believe it is unconscionable to subject them, namely, that they might be fired upon as they approach the vehicle.* As the Court observed in *Terry*, it is by definition "unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23, 88 S.Ct. at 1881. On the other hand, to insist that officers remain in their vehicles and order the occupants out ignores the fact that, with heavily tinted windows, the officers could never know whether all of the vehicle's occupants had exited; and, eventually, the officers would still be required under this alternative to approach a vehicle which, insofar as the officers could know, still held passengers who might be armed and dangerous. Ordering that the vehicle's doors be opened, of course, allows the vehicle's occupants legitimately to move about the vehicle in ways that would enable them to access available weapons, which represents a separate danger unto itself.
>
> Therefore, in the end, we believe, it will be impractical, if not impossible, for law enforcement officers to neutralize the dangers to which they are exposed by virtue of heavily tinted windows. There simply do not appear to be any alternatives to the bright-line rule we suggest, which would infringe less on the residual privacy interests that drivers and passengers retain in the interior compartment of a lawfully stopped vehicle, yet still

> allow law enforcement officers to take that control of the situation that enables them to minimize the risk of harm to themselves and to the vehicle's occupants. *Cf.* Wilson, 519 U.S. at ---, 117 S.Ct. at 886 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.") (quoting *Michigan v. Summers*, 452 U.S. 692, 703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981)). A bright-line rule that officers could always pursue the course of opening the door of a tinted-windowed vehicle when, in their informed judgment, such an act appears necessary to protect their safety, would not render the stops of such vehicles risk-free, but it would at least reduce to an extent the enormous danger to which law enforcement authorities are exposed as a consequence of the advent of tinted windows.
>
> 109 F.3d at 983. *Emphasis Added.*

Like the officers in *Stanfield*, Trooper Moynihan chose the alternative of approaching Jenkins' vehicle with his handgun drawn. Trooper Moynihan's decision was based on the totality of the circumstances surrounding the stop, his concern for safety and his experience as a Rhode Island State Police Trooper for the prior five (5) years. Neither this Court nor Plaintiff's expert should engage in *post hoc* evaluation of Trooper Moynihan's decision to approach Jenkins' vehicle and seek[7] to find fault by citing some alternative means by which the objectives of the police might have been accomplished. Jenkins has failed to establish that Trooper Moynihan's approach of his vehicle constituted a constitutional violation and, at the very least, the approach of the vehicle was not a clearly established constitutional right at the time of the incident and thus qualified immunity bars this claim.

Trooper Moynihan's decision to approach the vehicle cannot be construed as creating a situation that required him to use deadly force. As stated, there is no constitutional requirement that a high risk motor vehicle stop be conducted in a specific fashion under all circumstances. Moreover, Trooper Moynihan's decision to approach Jenkins' vehicle is not what required him to discharge his weapon; rather, it was Jenkins' pulling his hands into his vehicle contrary to the trooper's instructions. Thus, Trooper Moynihan's decision to approach Jenkins' vehicle is not a

[7] Especially when, as the Stanfield Court said, that alternative approach exposes the officers to "unconscionable danger."

question for the jury. Trooper Moynihan, similar to the officers in ***St.Hilaire v. City of Laconia***, 71 F.3d 20 (1st Cir.1995) and ***Napier v. Town of Windham***, 187 F.3d 177 (1st Cir.1999), is entitled to qualified immunity.

***State Claims***

The existence of reasonable and the application of qualified immunity defeat Plaintiff Jenkins' state claims. Wherefore, Counts I, II and III should be dismissed.

Defendants submit that qualified immunity is a bar to Plaintiff's state tort claims. The First Circuit in ***Hatch v. Town of Middletown, et als.***, 311 F.3d 83 (1st Cir.2002) ruled that qualified immunity was available to state officers defending claims under Rhode Island law, despite there being no decision from the Rhode Island Supreme Court on point. The ***Hatch*** Court based its decision on the Rhode Island Supreme Court's decisions in ***Pontbriand v. Sundlun***, 699 A.2d 856 (R.I.1997) and ***Ensey v. Culhane***, 727 A.2d 687 (R.I.1997). A thorough analysis of the application of qualified immunity to the State claims is set forth by Judge Torres in the ***Jennings*** case.

**i. Rhode Island Constitution**

Plaintiff Jenkins claims at Count V that his rights to be free from unwarranted search and seizures provided to him by Article I, Section 6 of the Rhode Island Constitution were violated. First, Plaintiff does not have a remedy under the Rhode Island Constitution where Plaintiff has sought to pursue his Fourth Amendment allegations under the Federal provisions. *Folan v. State/Department of Children, Youth & Families*, 723 A.2d 287, 292 (R.I. 1999). Secondly, these claims are based on the same set of facts and theories asserted by Jenkins under federal law. Defendants submit that for the reasons previously set forth in response to the federal claims, their stop, search and seizure of Jenkins were all supported by reasonable suspicion thereby

defeating this claim. Moreover, Troopers Moynihan and Borek acted as any objectively reasonable officer would have done under the same circumstances and, as such, are entitled to qualified immunity as a bar to this claim.

Wherefore, Defendants pray that Count V is denied and dismissed.

**ii. Negligence**

In Count One of his Complaint, Jenkins asserts a general claim negligence against Defendants; however he does not state with any specificity what acts or omissions he claims support this claim.[8] Jenkins has failed to establish any negligence in the selection, training, supervision and discipline of Troopers Moynihan or Borek relative to the events of June 25, 2002 or the "proper manner in which to effectuate a lawful search, seizure and arrest as well as how to employ force when effectuating a nonviolent arrest." See Plaintiff's Amended Complaint at ¶ 34. Moreover, Plaintiff has failed to set forth any evidence that would support a claim against the State of Rhode Island on a theory of respondeat superior. Therefore, Count I should be dismissed.

**iii. Battery**

At Count III Jenkins' asserts a claim based on the theory of battery. Defendants submit that qualified immunity is a bar to this claim. Defendants' incorporate by reference their argument addressing Plaintiff's excessive force claims. Accordingly, Defendants pray that this Court deny and dismiss Count Three.

[8] Count I provides "Defendants, by their individual and concerted actions and/or omissions, including but not limited to those described herein, breached the duty of car owed to Plaintiff thereby causing Plaintiff to sustain reasonably foreseeable harm and damages as aforesaid."

## V. LIST OF EXHIBITS

The Defendants may introduce the following documents, photographs or tapes:

a. Tape recording and/or transcript of Intercity Broadcast made by Woonsocket of the BOLO and dispatch of information to Rhode Island State Police

b. DVD of surveillance video from White Fuel Company from June 25, 2004.

c. Photographs taken by Rhode Island State Police at scene on June 25, 2002.

d. Rhode Island State Police Day Sheet, Lincoln Barracks, June 25, 2002

e. Rhode Island State Police Use of Force Policy

f. Rhode Island State Police Motor Vehicle Stop Policy (date)

g. Rhode Island State Police Map drawn by BCI troopers

h. Woonsocket Police Department Day Sheet for June 25, 2002

i. Use of Force Report Prepared by Trooper Moynihan

j. Discharge of Firearm Report Prepared by Trooper Moynihan

k. Use of Force Report Prepared by Trooper Borek

l. Certified copies of Plaintiff Emanuel Jenkins' convictions

m. Providence Police Report of 8/18/05

n. Pawtucket Police Department's Incident Report and Police Narratives of June 25, 2002 regarding the calls to Universal Cuts

o. Evidence Processing Reports of Trooper Moynihan's weapon on June 25, 2002.

p. Tape Recorded Statements and/or transcripts of Dispatcher Mulligan, Dispatcher Keith McCarthy, Brandi Ekwegh, Talisha Harmon, Eric Horsley, Lawrence Trombetti, Trooper Moynihan, Trooper Borek, Howard Soares

q. Report of <u>Michael Brave, J.D., M.S., C.L.S., C.L.E.T., C.P.S., C.S.T.</u>

r. AELE Expert Witness/ Litigation Consulting Listing for David Grossi internet page.

s. Rhode Island Hospital Report of bb pellet injury and x-ray reports.

t. Woonsocket Police Department, Incident Report # 01-9119-OF and Narrative of Patrolman Kevin Greenough.

## VI. ANTICIPATED MOTIONS IN LIMINE

At this time, the Defendants intend to file 4 motions *in limine*. The motions will be filed no later than September 26, 2006.

Defendants will file a motion in limine to exclude any evidence that there was not a gun located in Plaintiff's car or that Plaintiff did not have a gun at the time of the June 25, 2002 stop by the Rhode Island State Police.

Defendants will file a motion in limine to exclude any testimony that Plaintiff is currently receiving Social Security Disability as such benefits were not awarded due to a physical injury and Plaintiff does not intend to introduce expert evidence of a psychological injury causally related to the June 25, 2002 incident.

Defendants will file a motion in limine to exclude any evidence or claim by Plaintiff that he was not engaged in criminal conduct when he was stopped or shot by the Rhode Island State Police on June 25, 2002.

Defendants will file a motion in limine to exclude the testimony of Plaintiff's proposed expert David Grossi. Mr. Grossi's testimony is irrelevant and prejudicial to a qualified immunity defense. Mr. Grossi is not qualified to testify as to what constitutes a clear established constitutional right. The testimony of David Grossi should further be excluded because the Fourth Amendment only requires that a seizure fall within a range of reasonableness, not that the officer pursued the most prudent course of conduct as judged by 20/20 hindsight vision.

## VII. PROPOSED JURY INSTRUCTIONS

**JURY INSTRUCTION REQUEST NO. 1**

**GENERAL: NATURE OF CASE; BURDEN OF PROOF; DUTY OF JURY; CAUTIONARY**

Ladies and gentlemen: I will take a few moments now to give you some initial instructions about this ease and about your duties as jurors. At the end of the trial I will give you further instructions. I may also give you instructions during the trial. Unless I specifically tell you otherwise, all such instructions - both those I give you now and those I give you later - are equally binding on you and must be followed.

This is a civil case brought by the plaintiff Emanuel Jenkins against the defendants State of Rhode Island and Trooper Matthew Moynihan. The plaintiff alleges that the defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures and committed state tort claims against him. The defendants deny the allegations. It will be your duty to decide from the evidence whether the plaintiff is entitled to a verdict against defendants.

From the evidence you will decide what the facts are. You are entitled to consider that evidence in the light of your own observations and experiences in the affairs of life. You will then apply those facts to the law which I give you in these and in my other instructions, and in that way reach your verdict. You are the sole judges of the facts; but you must follow the law as stated in my instructions, whether you agree with it or not.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it.

In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any

motives they may have for testifying a certain way, their manner while testifying, whether they said something different at an earlier time, the general reasonableness of their testimony and the extent to which their testimony is consistent with other evidence that you believe.

Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

You should not take anything I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

## JURY INSTRUCTION REQUEST NO. 2

### BENCH CONFERENCES AND RECESSES

During the trial it may be necessary for me to speak with the lawyers out of your hearing, either by having a bench conference here while you are present in the courtroom, or by calling a recess. Please understand that while you are waiting, we are working. The purpose of these conferences is to decide how certain evidence is to be treated under the rules of evidence which govern the trial, and to avoid confusion and error. We will, of course, do what we can to keep the number and length of theses conferences to a minimum.

**JURY INTRUCTION REQUEST NO. 3**

**COURT'S VIEW**

I have not expressed nor have I intended to intimate any opinion as to which witnesses are or are not worthy of belief, what facts are or are not established, or what inference or inferences should be drawn from the evidence. If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to disregard it. You are, I repeat, the exclusive, sole judges of all of the questions of fact submitted to you and of the credibility of the witnesses. Your authority, however, is not to be exercised arbitrarily; it must be exercised with sincere judgment, sound discretion, and in accordance with the rules of law that I give you. In making your determination of the facts in this case, your judgment must be applied only to that which is properly in evidence. Arguments of counsel are not in evidence, although you may give consideration to those arguments in making up your mind on what inferences to draw from the facts which are in evidence.

From time to time the court has been called upon to pass upon the admissibility of certain evidence, although I have tried to do so, in so far as it was practicable, out of your hearing. You have no concern with the reasons for any such rulings and you are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law in the province of the court and outside the province of the jury. In admitting evidence to which objection has been made, the court does not determine what weight should be given to such evidence, nor does it pass on the credibility of the evidence. Of course, you will dismiss from your mind completely any evidence that has been ruled out of the case by the court, and you will refrain from speculation or

conjecture or any guesswork about the nature or effect of any colloquy between court and counsel held out of your hearing or sight.

I also ask you to draw no inference from the fact that upon occasion I asked questions of certain witnesses. These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses. You are expressly to understand that the court has no opinion as to the verdict you should render in this case.

**JURY INSTRUCTION REQUEST NO. 4**

**CONDUCT OF COUNSEL**

It is the duty of the attorney on each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All those questions of law must be decided by me, the court. You should not show any prejudice against an attorney or his or her client because the attorney objected to the admissibility of evidence, or asked for a conference out of the hearing of the jury or asked the court for a ruling on the law.

As I already indicated, my rulings on the admissibility of evidence do not, unless expressly stated by me, indicate any opinion as to the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

**JURY INSTRUCTION REQUEST NO. 5**

**SYMPATHY**

Under your oath as jurors you are not to be swayed by sympathy. You should be guided solely by the evidence presented during the trial, without regard to the consequences of your decision.

You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy interfere with your clear thinking there is a risk that you will not arrive at a just verdict. All parties to a civil lawsuit are entitled to a fair trial. You must make a fair and impartial decision so that you will arrive at a just verdict.

**JURY INSTRUCTION REQUEST NO. 6**

**EVIDENCE; LIMITATIONS**

I have mentioned the word “evidence.” “Evidence” includes the testimony of witnesses; documents and other things received as exhibits; any facts that have been stipulated- that is, formally agreed to by the parties; [and any facts that have been judicially noticed - that is facts which I say you must accept as true.]

Certain things are not evidence. I will list those things for you now:

1. Statements, arguments, questions and comments by lawyers are not evidence.

2. Exhibits that are identified by a party but not offered or received in evidence are not evidence.

3. Objections are not evidence. Lawyers have a right and sometimes an obligation to object when they believe something is improper. You should not be influenced by the objection. If I sustain an objection to a question or an exhibit, you must ignore the question or the exhibit and must not try to guess what the information might have been.

4. Testimony and exhibits that I strike from the record, or tell you to disregard, are not evidence and must not be considered.

5. Anything you see or hear about this case outside the courtroom is not evidence.

Furthermore, a particular item of evidence is sometimes received for a limited purpose only. That is, it can be used by you only for one particular purpose, and not for any other purpose. I will tell you when that occurs, and instruct you on the purposes for which the item can and cannot be used.

Finally, some of you may have heard the terms ‘direct evidence” and

"circumstantial evidence." You are instructed that you should not be concerned with those terms, since the law makes no distinction between the weight to be given to direct and circumstantial evidence.

## JURY INSTRUCTION REQUEST NO. 7

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence that you may properly use in reaching your verdict.

One type of evidence is direct evidence. Direct evidence is when a witness testifies about something he knows by virtue of his own senses-something he has seen, felt, touched, or heard. Direct evidence may also be in the form of an exhibit where the fact to be proved is its present existence or condition.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse.

Assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not see outside. As you were sitting here, someone walked in with an umbrella that was dripping wet. Then a few minutes later another person also entered with a wet umbrella. Now, you cannot look outside of the courtroom and you cannot see whether or not it it raining. So you have no direct evidence of that fact. But on the combination of facts that I have asked you to assume it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.

Circumstantial evidence is of no less value than direct evidence; for, it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but simply requires that your verdict must be based on a preponderance of all of the evidence presented.

**JURY INSTRUCTION REQUEST NO. 8**

**BURDEN OF PROOF**

This is a civil case and as such the plaintiff Emanuel Jenkins has the burden of proving the allegations of his complaint by a preponderance of the evidence. The Defendants do not have a burden to prove anything.

If after considering all of the testimony you are satisfied that the plaintiff has carried the burden on each essential point as to which he has the burden of proof, then you must find for the plaintiff on his claims. To prove something by the preponderance of the evidence is to prove that it is more likely true than not true. It is determined by considering all of the evidence and deciding which evidence is more believable. If after such consideration you find the testimony of both parties to be in balance or equally probable, then the plaintiff has failed to sustain his burden and you must find for the defendant.

If upon consideration of all the facts on the issue of the Defendants' fault you find that the plaintiff has failed to sustain the burden cast upon him, then you proceed no further and your verdict must be for the Defendants State of Rhode Island and Trooper Matthew Moynihan.

**JURY INSTRUCTION REQUEST NO. 9**

**PREPONDERANCE OF THE EVIDENCE**

What does a "preponderance of evidence" mean? To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them. That plaintiff introduced a particular document does not prevent you from using that document to support a claim of the defendant; that defendant called a particular witness does not prevent you from using testimony by that witness to support a claim made by plaintiff.

If you find that the credible evidence on a given issue is evenly divided -- that it is equally probable that one side is right as it is that the other side is right - then you must decide that issue against the party having the burden of proof. That is because the party bearing this burden must prove more than simple equality of evidence - he must prove the element at issue by a preponderance of the evidence. On the other hand, the party with this burden of proof need prove no more than a preponderance. So long as you find that the scales tip, however slightly in favor of the party with this burden of proof-that what the party claims is more likely true than not true, then that element will have been proved by a preponderance of the evidence.

**JURY INSTRUCTION REQUEST NO. 10**

**CREDIBILITY OF WITNESSES**

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of it, or none of it.

In deciding what testimony to believe, you may consider a witness' intelligence, the opportunity a witness had to see or hear the things testified about, a witness' memory, any motives a witness may have for testifying a certain way, the manner of a witness while testifying, whether a witness said something different at an earlier time,[1] the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

In deciding whether or not to believe a witness, keep in mind that people sometimes hear or see things differently and sometimes forget things. Two people witnessing an event may see or hear it differently. You need to consider therefore whether a contradiction is an innocent misrecollection or lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or only a small detail.

**JURY INSTRUCTION REQUEST NO. 11**

**IMPEACHMENT BY PRIOR INCONSISTENT STATEMENTS**

You have heard evidence that at some earlier time the witness has said or done something which counsel argues is inconsistent with the witness's trial testimony.

Evidence of a prior inconsistent statement is not to be considered by you as affirmative evidence in determining liability. Evidence of a prior inconsistent statement was placed before you for the more limited purpose of helping you decide whether to believe the trial testimony of the witness who contradicted himself. If you find that the witness made an earlier statement that conflicts with his trial testimony, you may consider that fact in deciding how much of his trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so, how much, if any, weight to give to the inconsistent statement in determining whether to believe all or part of the witness's testimony.

## <u>JURY INSTRUCTION REQUEST NO. 12</u>

## FOURTH AMENDMENT - REASONABLENESS

The Fourth Amendment to the United States Constitution provides citizens with the right to be protected against unreasonable searches and seizures.

Reasonableness is to be determined by balancing the nature an quality of the intrusion on an individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion.

<u>United State v. Place</u>, 462 U.S. 696 (1983)

**JURY INSTRUCTION REQUEST NO. 13**

**Civil Rights**
**42 U.S.C. § 1983**
**Fourth Amendment Claim**
**Excessive Force**

In this case the Plaintiff claims that the Defendants, while acting "under color" of state law, intentionally deprived the Plaintiff of his rights under the Constitutions of the United States and Rhode Island.

Specifically, the Plaintiff claims that while the Defendants were acting under color of authority of the State of Rhode Island as members of the Rhode Island State Police, they intentionally violated the Plaintiff's constitutional right to be free from the use of excessive or unreasonable force. Defendant Trooper Matthew Moynihan denies that he violated the Plaintiff's constitutional rights. Trooper Matthew Moynihan claims that he used reasonable force in the stop of Plaintiff.

The law provides that a person may sue in this Court for an award of money damages against anyone who, "under color" or any state law or custom, intentionally violates the Plaintiff's rights under the constitution of the United States.

In order to prevail on his claim, the Plaintiff must prove each of the following facts by a preponderance of the evidence:

First: That the Defendant intentionally committed the acts that violated Plaintiff's federal constitutional right not to subjected to excessive or unreasonable force during an arrest.

Second: That in so doing the Defendant acted "under the color" of the authority of the State of Rhode Island; and

Third: That the Defendant's acts were the proximate or legal cause of the damages sustained by the Plaintiff.

**JURY INSTUCTION REQUEST NO. 14**

**UNDER COLOR**

A state or local official acts "under color" or the authority of the state not only when the official acts within the limits of lawful authority, but also when the official acts without or beyond the bounds of lawful authority. In order for unlawful acts of an official to be done "under color" of state law, however, the unlawful acts must be done while the official is purporting or pretending to act in the performance of official duty; that is, the unlawful acts must be an abuse or misuse of power which is possessed by the official only because of the position held by the official.

**<u>JURY INSTRUCTION REQUEST NO. 15</u>**

**DELIBERATE INDIFFERENCE - §1983**

The Defendants can be held liable only on the basis on their own acts or omissions, that is, acts or omissions that can be considered reckless or careless indifference to the constitutional right of the Plaintiff. ***<u>Id.</u>*** Therefore, if you find that the Defendants did not act or fail to act in a reckless or careless indifference to the rights of the Plaintiff, then you must find in favor of the Defendants. Accordingly, your sole focus of inquiry in determining whether or not these Defendants were deliberately indifferent to the Plaintiff's constitutional rights.

**JURY INSTRUCTION REQUEST NO. 16**

**PROXIMATE CAUSE**

(A) A proximate cause of damages is when the act or conduct of the Defendants produce damages to the Plaintiff. In other words, but for the conduct of the Defendants, the damages to the Plaintiff would not have occurred.

(B) The Defendants are liable for the natural and probable consequences of their actions. The Defendants' conduct may be the proximate cause of Plaintiff's damages even if it is not the sole cause, the only cause or the latter cause of Plaintiff's damages. The Defendants' conduct is the proximate cause if it concurs and unites with some other cause which acting at the same time produces damages to the Plaintiff.

**JURY INSTRUCTION REQUEST NO. 17**

**USE OF FORCE**

Plaintiff Jenkins' claims the Defendant police officer Trooper MatthEw Moynihan used excessive force. Whether or not the force used in making an arrest unreasonable is question to be determined by you in light of all the evidence received in the case.

You must determine the degree of force that a reasonable and prudent police officer would have applied in affect the arrest under the circumstances shown from the evidence received in this case. In determining whether the defendant police officers used excessive force, you may consider:

1. The extent of the injury suffered,
2. The need for the application of force,
3. The relationship between the need and the amount of force used,
4. The threat reasonably perceived by the responsible officials, and
5. Any effort made to temper the severity of a forceful response. Injuries which result from, for example, an officer's uses of force to overcome resistance to arrest do not involve constitutionally protected interests. An officer's use of excessive force does not give constitutional protection against injuries that would not have occurred absent the excessive force.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight. The nature of reasonableness must allow for the fact the police officers are often forced to make split-second judgments- under circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation. Moreover, if an officer

reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

This reasonableness inquiry is an objective one. The question is whether the defendant police officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent of motivation.

If you find that Plaintiff Jenkins has proven plaintiff's claim, you must then consider the defense of plaintiff police officers that their conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident in issue and that they are therefore not liable. If you find that Trooper Moynihan did not instruct Plaintiff Jenkins to unlock the door and Plaintiff Jenkins pulled his hands in from the car window then you must find in favor of the defendants.

Police officers are presumed to know about the clearly established constitutional rights of citizens.

If, after considering the scope of discretion and responsibility generally given to police officers in the performance of their duties, and after considering all of the surrounding circumstances of the case they would have reasonably appeared at the time of the arrest, you find from preponderance of the evidence that Plaintiff Jenkins has proved that the defendant trooper knowingly violated the law regarding the plaintiff's constitutional rights, you must find for plaintiff.

If, however, you find that defendant police officers had a reasonable belief that their actions did not violate the constitutional rights of the plaintiff, then you cannot find defendant police officers liable even if the plaintiff's rights were in fact violated as a result of the defendant police officers' objectively reasonable action.

Whether or not the force used in making an arrest was unreasonable is question to be determined by you in light of all the evidence received in the case based on the facts as known to the officers at that point in time.

*Graham*, 109 S.Ct. at 1872-1873; *Saucier*, 533 U.S. at 205, 121 S.Ct at 2158.

## JURY INSTRUCTION REQUEST NO. 18

## USE OF DEADLY FORCE

The use of deadly force is constitutional only if, at a minimum, a suspect poses a significant threat of death or serious physical injury to police officers or civilians.

Jarret v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003).

**JURY INSTRUCTION REQUEST NO. 19**

**QUALIFIED IMMUNITY - §1983**

Qualified immunity protects state officials such as all of the named Defendants in the above-entitled matter, in the exercise of their discretion, "from [personal] liability for civil damages insofar as [their] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ***Harlow v. Fitzgerald***, 457 U.S. 800 (1982).

Qualified immunity is defined as:

> [G]overnment officials performing discretionary functions [have] qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought to be consistent with rights they are alleged to have violated. Somewhat more concretely, whether an official protected by qualified immunity may be held to be personally liable for an allegedly unlawful official action generally turns on the "objective reasonableness" of the action assessed in light of the legal rules that were "clearly established" at the time it was taken. (citations omitted)

"Clearly established" means "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." ***Anderson***, 483 U.S. at 640.

Entitlement to qualified immunity gives a government official immunity from process of litigating the case itself rather than merely affording a defense to liability. Qualified immunity is effectively lost if a case is erroneously permitted to go to trial. ***Mitchell***, 472 U.S. at 525-26.

"[S]tate officials exercising discretionary authority are entitled to qualified immunity insofar as their conduct does not transgress clearly established constitutional or federal statutory rights of which a reasonably prudent official should have been aware."

***Buenrostro v. Collazo***, 973 F.2d 39, 42 (1st Cir. 1992). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" ***Hunter v. Bryant***, 112 S.Ct. 534, 537 (1991) (*quoting* ***Malley***, 475 U.S. at 343). "In essence, then, the defense of qualified immunity offers sanctuary not only to government officials who act with impeccable propriety, but also to those who err but could not have reasonably understood that their actions infracted a prospective plaintiff's federally assured rights."
***deQuintero v. Aponte-Rogue***, 974 F.2d 226, 228 (1st Cir. 1992) (citations omitted).

This court must ascertain whether the Plaintiff has alleged, with the requisite particularity, that a state actor violated some right that emanated from federal law." ***Id.*** (*citing* ***Siegart v. Gilley***, 111 S.Ct. 1789, 1793 (1991)). Next, it must "ascertain whether the right at issue was 'clearly established' at the time of the infringement." ***Anderson v. Creighton***, 483 U.S. 635, 640 (1987). Then you must decide whether the Defendants in this case acted reasonably under the circumstances. If you find that the Defendants did act reasonably, then you must find in favor of the Defendants.

**JURY INSTRUCTION REQUEST NO. 20**

**JUDICIAL NOTICE**

Even though no evidence may have been introduced about it, I have decided to accept as provide the following facts:

1. Trooper Matthew Moynihan's stop and approach of Plaintiff Jenkins' SUV was constitutional.
2. Trooper Matthew Moynihan's removal of Plaintiff Jenkins from his SUV was constitutional.

The rules of evidence permit the judge to accept facts, which the judge believes cannot be reasonably disputed. You must, therefore, accept these facts as proved.

**JURY INSTRUCTION REQUEST NO. 21**

**NEGLIGENCE DOES NOT AMOUNT TO A FEDERAL CONSTITUTIONAL VIOLATION**

Negligence under state law does not amount to a federal constitutional violation. Boveri v. Town of Saugus, 113 F.3d 4 (1st Cir. 1997)

A regulatory violation, like a violation of state law, is not inherently sufficient to support a §1983 claim. *Boveri v. Town of Saugus*, 113 F.3d 4 (1st Cir. 1997).

**JURY INSTRUCTION REQUEST NO. 22**

**NEGLIGENCE**

In a negligence action the plaintiff must establish that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty of care and that the defendant's breach of that duty was a proximate cause of harm or injury about which the plaintiff complains.

**JURY INSTRUCTION REQUEST NO. 23**

**BATTERY**

Plaintiff claims that the Defendant committed a battery on his person.

A battery refers to an act that was intended to cause and in fact does cause an offensive contact with or unconsented touching of or trauma upon the body of another thereby resulting in the consummation of an assault. An intent to injure a plaintiff, however, is unnecessary in a situation in which the defendant willfully sets in motion a force that in ordinary course causes an injury. In order to recover for a battery a plaintiff must show that there was an offensive contact with or unconsenting touching of a body of another. Thus, if any person accidentally and/or inadvertently touches another individual , that would not constitute a battery . In order to constitute a battery, a person must intend to cause the offensive contacted or unconsensual touching of another person.

Police officers are protected from liability for assault and battery if the police officer used reasonable force to effectuate an arrest. If you find that the Defendants used reasonable force to effectuate a legal arrest of Plaintiff, then you must return a verdict in favor of the Defendants. If, however, you find that defendant police officers had an objectively reasonable belief that probable cause existed to arrest Plaintiff and the use of force to effectuate the arrest was reasonable, then you must return a verdict in favor of the Defendants.

**JURY INSTRUCTION REQUEST NO. 24**

**RESPONDEAT SUPERIOR**

In this case the Plaintiff alleges that the Defendant State of Rhode Island was the master of Trooper Matthew Moynihan who acted as Defendant State of Rhode Island's servants. If you find this to be true, then under the doctrine of respondeat superior the Defendant State of Rhode Island is legally responsible for the actions of Trooper Moynihan.

## JURY INSTRUCTION REQUEST NO. 25

### SPECULATION AND CONJECTURE

The Plaintiff cannot rely on conjecture or speculation to establish the essential elements of a prima facie case of negligence.

**JURY INSTRUCTION REQUEST NO. 26**

**DAMAGES TO BE REASONABLE**

If you, the jury, determine under the rules and definitions I have given you, that plaintiff is entitled to recover damages, and only if you so determine, then he is entitled to recover only fair, just and reasonable compensation. It is not proper for a jury in considering the question of damages to attempt to be generous, rather than fair and reasonable. Damages must be based on the evidence so as to reasonably compensate the injured party.

**JURY INSTRUCTION REQUEST NO. 27**

**COMPENSATORY DAMAGES**

The purpose of the law of damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from defendant's actions. These are known as compensatory damages.

You should not award compensatory damages unless the damages have been proven by a fair preponderance of the evidence.

In awarding compensatory damages, if you decide to award them, you must be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. Although mathematical exactitude is not required, damages must be based on reasonable and probable estimates.

In all instances, you are to use sound discretion in fixing an award of damages, drawing reasonable inferences where you deem appropriate from the facts and circumstances in evidence. Damages based on conjecture or speculation are not recoverable.

Fed. Jury Instructions 77-3; Tom Shaw, Inc. v. Derecktor, 639 F.Supp. 1064 (D.R.I. 1986); Rhode Island Turnpike and Bridge Authority v. Bethlehem Steel Corp., 379 A.2d 344, appeal after remand, 415 A.2d 1295 (R.I. 1977);
Moran Towing Corp. v. M.A. Gammino Const. Co., 244 F.Supp. 729, vacated and remanded 363 F.2d 108, on remand 292 F.Supp.134, aff'd in part and remanded, 409 F.2d 917.

**JURY INSTRUCTION REQUEST NO. 28**

**DAMAGES--CAUSE, SPECULATION**

Damages can only be awarded for those injuries that the plaintiff has proven, by a fair preponderance of the evidence, and with a reasonable probability, resulting from the negligence of the defendant. You cannot award damages for any injury which may possibly have resulted from the incident. You are not to speculate or guess as to the extent of plaintiff's injuries. It is incumbent upon plaintiff to satisfy you, by a fair preponderance of evidence, as to the amount which ought to be recovered as damages. It is not the burden of any defendant to disprove the claimed injuries.

Tom Shaw, Inc. v. Derecktor, 639 F.Supp. 1064 (D.R.I. 1986); Moran Towing Corp. v. M.A. Gammino Const. Co., 244 F.Supp. 729, vacated and remanded 363 F.2d 108, on remand 292 F.Supp.134, aff'd in part and remanded, 409 F.2d 917; Conn. Jury Instructions §222 (f) &(g).

**JURY INSTRUCTION REQUEST NO. 29**

**PUNITIVE DAMAGES**

The Plaintiff also claims that the acts of the Defendant Trooper Matthew Moynihan was done with malice or reckless indifference to the Plaintiff's federally protected rights so as to entitle the Plaintiff to an award of punitive damages in addition to compensatory damages. Punitive damages are to punish defendant Trooper Moynihan for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct.

If you find for the Plaintiff, and if you further find that Defendant Trooper Moynihan did act with malice or reckless indifference to the Plaintiff's federally protected rights, the law would allow you in your discretion to assess punitive damages against Defendant Trooper Moynihan as punishment and as a deterrent to others.

## VIII. PROBABLE LENGTH OF TRIAL

Defendants expect that this case will last 4 to 5 days.

Respectfully Submitted,

DEFENDANTS

By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ Brenda D. Baum
/s/ James R. Lee

Brenda D. Baum (5184)
Assistant Attorney General
James R. Lee (4305)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov
jlee@riag.ri.gov

**CERTIFICATION**

I hereby certify that I have electronically mailed the foregoing document on this 13th day of September, 2006 to the attorney(s) of record listed below.

V. Edward Formisano, Esq.
edf@sfclaw.com

/s/ Brenda D. Baum